James Thomas **CAHILL**, Petitioner,

v.

Ruth **RUSHEN**, Director, California Department of Corrections, Respondent.

**Civ. No. S–78–603 LKK.**

United States District Court,
E. D. California.

Dec. 2, 1980.

Mark L. Christiansen, Deputy State Public Defender, Sacramento, Cal., for petitioner.

Shirley A. Nelson, Deputy Atty. Gen., Sacramento, Cal., for respondent.

## OPINION AND ORDER

KARLTON, District Judge.

Petitioner, a state prisoner, seeks a writ of habeas corpus. 28 U.S.C. § 2254. He is confined as a result of a conviction for first degree murder and challenges that confinement alleging: (1) a confession obtained in violation of both his Sixth Amendment right to counsel and his Fifth Amendment privilege against self–incrimination was employed in securing his conviction, and (2) the prosecutor improperly argued that the jury should infer guilt from petitioner's post–arrest silence in violation of his Fourteenth Amendment right to due process of law.

### FACTS

During the early morning hours of September 15, 1971, a survey crew discovered the body of Orville Scott lying beside a picnic table in the Lakeshore West Campground near Lake Shasta, California. Two days later petitioner and Alton Whitecotton were arrested in Colfax, California and charged with murder.[1] The officer in charge of the investigation, Captain James Carter of the Shasta County Sheriff's Department, questioned petitioner on the day of his arrest and the following day. On both occasions petitioner was given *Miranda*[2] warnings and waived his rights.

Petitioner and Whitecotton were arraigned on September 19 in Central Valley

Justice Court on charges of first degree murder. On September 27, the day before a grand jury handed down an indictment, Captain Carter again talked to petitioner. After being advised of his Fifth Amendment rights, petitioner informed Captain Carter during the ensuing conversation that, although he desired representation, he was not represented by counsel. Captain Carter questioned petitioner the following day without advising him of his *Miranda* rights. Petitioner again informed Carter that he was not represented by counsel and desired at least one, possibly two attorneys, to handle his case but, as was the case during all of the interviews, he did not request the presence of an attorney. At that interview, petitioner agreed that after his trial he would tell his interrogator what happened at the campground.

At trial Alton Whitecotton testified against petitioner as an eyewitness. On November 20, the jury brought in a verdict of guilty; petitioner waived preparation of the Probation Report and was sentenced immediately. The following day Captain Carter had petitioner brought from the jail to his office. During the ensuing conversation petitioner made a full confession.[3]

On appeal, the California Court of Appeal held that the trial court erred in ruling as a matter of law that the eyewitness, Alton Whitecotton, was not an accomplice and reversed petitioner's conviction.[4] A second trial ensued.

At petitioner's second trial, Alton Whitecotton again testifed as an eyewitness. The last witness called by the prosecution was Captain Carter who testified to petitioner's confession. Petitioner was again convicted of first degree murder and the California

---

1. Whitecotton was later convicted of being an accessory after the fact to murder.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Since the details surrounding the conversation of September 28 and November 21 are critical to my decision in this case, they will be examined in greater detail later in the opinion.

4. *People v. Cahill*, 3 Crim. 6850 (Oct. 29, 1974) (unpublished opinion). The appellate court relied on *People v. Gordon*, 10 Cal.3d 460, 110 Cal.Rptr. 906, 516 P.2d 298 (1973), in which the California Supreme Court ruled that when the evidence indicates that a crime might have been committed by either the witness or the defendant, although not necessarily by both parties, the jury must be given an accomplice instruction. *Id.* at 468–469, 110 Cal.Rptr. 906, 516 P.2d 298.

Court of Appeal affirmed this second conviction. The California Supreme Court denied review.

## THE CONFESSION AND THE SIXTH AMENDMENT

■ "Confessions [are] a proper element in law enforcement ... admissible in evidence," *Miranda v. Arizona, supra,* at 478, 86 S.Ct. at 1629, nonetheless, a confession must be excluded if it is taken in violation of an individual's privilege against self-incrimination, *id.,* or right to the assistance of counsel. *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Although petitioner alleges a violation of both rights, I shall address the Sixth Amendment principles implicated in this case because I believe them dispositive.[5]

In *Massiah v. United States,* the Supreme Court held that "petitioner was denied the basic protection of [his Sixth Amendment] guarantee [of a right to counsel] when there was used against him at his trial evidence of his own incriminating words, which [police] had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). In order to establish that he comes within the rule announced in *Massiah,* petitioner must demonstrate that his confession was "deliberately elicited ... at a time when he was clearly entitled to a lawyer's help." *Id.* at 204, 84 S.Ct. at 1201.

## I. *Sixth Amendment Right to Counsel*

The threshold question confronting this court is whether the rule established in

*Massiah* has any application when the defendant has been convicted and sentenced before he makes incriminating statements. Since the right to counsel had clearly attached[6] and petitioner was represented by counsel, the applicability of *Massiah* may seem obvious. Indeed the California Court of Appeal, after noting that "adversary proceedings had long since commenced," *People v. Cahill,* 3 Crim. 8082 at 12 (Mar. 14, 1978) (unpublished opinion), proceeded to its resolution of the *Massiah* issue. Nonetheless, the fact that the confession *sub judice* was made subsequent to the entry of judgment and sentence raised questions in my mind as to the applicability of the *Massiah* rule. Accordingly, I requested further briefing from the parties on the issue.

■ The state argues that petitioner was not entitled to the benefits of the *Massiah* rule vis a vis his second trial until the Court of Appeal reversed his first conviction. Implicit in this contention is the idea that the Sixth Amendment protects the attorney/client relationship "at trial" and that the entry of judgment and sentence terminates the need to protect this relationship. Assuming the Sixth Amendment applies solely to "trials" (a question that need not be answered in this case), respondent has defined the duties of "trial" counsel too narrowly since "the trial attorney has an affirmative duty to protect his client's right to appeal by filing a notice of appeal, or by telling his client how the client can proceed on his own behalf." *Gairson v. Cupp,* 415

---

**5.** Respondent contends that petitioner's Fifth and Sixth Amendment claims are not cognizable in this court since petitioner received an opportunity for a full and fair hearing on his claim citing *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) and *Richardson v. Stone,* 421 F.Supp. 577 (N.D.Cal.1976). The Ninth Circuit has specifically rejected this contention regarding Fifth Amendment claims, *Patterson v. Warden,* 624 F.2d 69, 70 (9th Cir. 1980), and the Supreme Court has continued to address Sixth Amendment claims raised by state prisoners in habeas proceedings, *see, e. g. Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Petitioner's claims are cognizable in this court. *See Berg v. Morris,* 483 F.Supp. 179, 184–185 (E.D.Cal.

1980); *see also Brewer v. Williams,* 430 U.S. 387, 413–414, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (Powell, J. concurring).

**6.** A Sixth Amendment right to counsel attaches with formal arraignment, *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (plurality opinion), and "[t]he rule of *Massiah* serves the salutory purpose of preventing police interference with the relationship between a suspect and his counsel once [such] formal proceedings have been initiated." *United States v. Henry,* 447 U.S. 264, 276, 100 S.Ct. 2183, 2190, 65 L.Ed.2d 115 (1980) (Powell, J. concurring).

F.2d 352, 353 (9th Cir. 1969). *See Miller v. McCarthy*, 607 F.2d 854 (9th Cir. 1979); *Riser v. Craven*, 501 F.2d 381 (9th Cir. 1974) (en banc). Petitioner was sentenced on November 20, 1972, and a notice of appeal was filed on December 27, 1972.[7] On November 21, the day the confession was obtained, the Sixth Amendment guaranteed petitioner the assistance of counsel since his attorney's "trial" duties had not yet been discharged.

Although respondent has not argued a functional distinction between pre and post trial counsel, such a distinction can be made. Thus it may be said that even if a Sixth Amendment right to counsel formally continues until the filing of a notice of appeal or until the defendant has been apprised of his appellate rights, the functional differences between the role of counsel before sentencing and his role after sentencing militate against application of the *Massiah* rule in this case. The argument would be structured as follows: *Massiah* seeks to protect the right of a defendant to the advice of counsel as it relates to the gathering and introduction of evidence at trial. Once judgment and sentence have been imposed, the function of the attorney changes even if a continuing legal relationship between the defendant and his attorney exists. This function includes marshalling an adequate record on appeal and arguing the prejudicial effect of alleged errors at the first trial. Permitting law enforcement to gather information from the defendant would not interfere with *this* relationship and thus *Massiah* should not apply. Since the argument originated with me I found it initially persuasive; now, however, I do not believe it correct.

Two basic flaws infect this analysis - it fails to properly focus upon counsel's advisory role and the purpose of appeal. The present case is not an instance of law enforcement discovering further evidence of guilt from an independent source while an appeal is pending. Rather, the statement was obtained from the defendant after he was entitled to the advice of an attorney as to whether he should speak at all and with-

out the benefit of such advice. Such advice is an aspect of the broad out-of-court counseling function performed by attorneys which furnishes the underpinning of *Massiah* and its progeny. If the focus is narrowed and limited to an attorney's litigation function, *Massiah's* rule becomes difficult to rationalize. Such a limited focus led Mr. Justice Rhenquist to complain that "[t]he doctrinal underpinnings of *Massiah* have been largely left unexplained, and the result in this case, as in *Massiah*, is difficult to reconcile with the traditional notions of the role of an attorney." *United States v. Henry*, 447 U.S. 264, 290, 100 S.Ct. 2183, 2197, 65 L.Ed.2d 115 (1980) (Rhenquist, J. dissenting). A broader view which recognizes an attorney's counseling function clearly demonstrates both the "doctrinal underpinnings of *Massiah*" and its application to the present case. An attorney is not a mere courtroom gladiator, he

> act[s] as a spokesman for, or advisor to, the accused. The accused's right to the "Assistance of Counsel" has meant just that, namely, the right of the accused to have counsel *acting as his assistant....* In *Massiah* counsel could have advised his client on the benefits of the Fifth Amendment and could have sheltered him from the overreaching of the prosecution.

*United States v. Ash*, 413 U.S. 300, 312, 93 S.Ct. 2568, 2575, 37 L.Ed.2d 619 (1973) (emphasis added). The guarantee of counsel, in addition to assuring equality in trial-like adversary confrontations, prevents the accused from being misled by his lack of familiarity with the law. *Id.* at 306–313, 93 S.Ct. at 2572, 2575. Application of *Massiah* to post trial statements when an appeal is not final, will protect this right to "counsel," "assistance," "advice," and "shelter." Moreover, a refusal to apply *Massiah* to the present facts would also frustrate the goal of an appeal - a second trial uncontaminated by constitutional or other reversible error. Errors in the first trial would permit the introduction of evidence obtained in violation of the defendant's properly construed Sixth Amendment rights in a second trial.

---

7. On the same day, petitioner substituted himself *in propria persona* for his trial attorney.

Finally, the application of the *Massiah* rule to the circumstances of the present case will not have an undue effect on legitimate law enforcement objectives. There are few circumstances which justify investigation of a crime after the perpetrator has been convicted and, in those few instances where further investigation of the crime may be necessary, application of the *Massiah* rule would pose no bar. Only the use of post trial statements deliberately elicited and introduced for the purpose of establishing guilt at a later trial would be barred.

For all of the above reasons, I hold that a criminal defendant has a right to the advice and counsel of an attorney regarding any statements he makes to law enforcement or its agents concerning the facts of a crime for which he is being prosecuted that continues at least through the filing of a notice of appeal (or the expiration of the time for filing such a notice). Accordingly, any statement that is deliberately elicited by law enforcement officers or their agents between sentencing and the filing of a notice of appeal, in the absence of counsel and without a waiver of counsel's presence, has been obtained in violation of the defendant's Sixth Amendment right to counsel and must be excluded upon a retrial for the same crime. I must now determine if the statements obtained by Captain Carter were "deliberately elicited" within the meaning of *Massiah* and its progeny.

### DELIBERATE ELICITATION

The meaning of "deliberately elicited" becomes clear once the right protected by *Massiah* and its progeny is sharply defined. This group of cases is not directed toward "coerced" confessions; the Fifth Amendment's privilege against self–incrimination bars the use of confessions obtained as a result of custodial interrogation in the absence of a knowing waiver of Fifth Amendment rights, *see, e. g., Miranda v. Arizona, supra,* and the due process clauses of the Fifth and Fourteenth Amendments bar the use of confessions that are not the product of the free will of the defendant. *See, e. g.,*

*Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Thus, for Sixth Amendment purposes, the fact that a confession may be "voluntary" (a product of the defendant's untrammeled free will) or "volunteered" (not the result of custodial interrogation) is simply irrelevant. Rather, *Massiah* seeks to protect the attorney's role as counselor and advocate in its broadest sense.

Last term the Supreme Court took great pains to demonstrate that the different interests protected by the Fifth and Sixth Amendments require different standards for judging the exclusionary rules under each amendment. Thus, "custody" and "interrogation," the bench marks for Fifth Amendment cases, are not central to Sixth Amendment cases. The Court observed:

> There is language in the opinion of the Rhode Island Supreme Court in this case suggesting that the definition of "interrogation" under *Miranda* is informed by this Court's decision in *Brewer v. Williams,* 430 U.S. 387 [97 S.Ct. 1232, 51 L.Ed.2d 424]. This suggestion is erroneous. Our decision in *Brewer* rested solely on the Sixth and Fourteenth Amendment right to counsel. That right as we held in *Massiah v. United States,* 377 U.S. 201, 206 [84 S.Ct. 1199, 1203, 12 L.Ed.2d 246], prohibits law enforcement officers from "deliberately elicit[ing]" incriminating information from a defendant in the absence of counsel after a formal charge against the defendant has been filed. Custody in such a case is not controlling; indeed the petitioner in *Massiah* was not in custody.... The definitions of "interrogation" under the Fifth and Sixth Amendments, if indeed the term "interrogation" is even apt in the Sixth Amendment context, are not necessarily interchangeable since the policies underlying the two constitutional protections are quite distinct.

*Rhode Island v. Innis,* 446 U.S. 291, 300 n.4, 100 S.Ct. 1682, 1689 n.4, 64 L.Ed.2d 297 (1980) (some citations omitted).[8]

---

8. Of course, this is not to say that actual interrogation is not relevant in a Sixth Amendment case. Clearly "affirmative interrogation, ab-

sent waiver, would certainly satisfy *Massiah* ...." *United States v. Henry, supra,* 100 S.Ct. at 2187.

Since "coercion" is not a Sixth Amendment question, "voluntariness" simply plays no part in the test of admissibility. An examination of the Supreme Court's treatment of various Sixth Amendment cases makes this clear. In *McLeod v. Ohio*, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965) (per curiam), the Supreme Court summarily reversed, citing *Massiah*, despite the lower court's determination that the defendant made his incriminating statements "while he was *voluntarily* endeavoring to aid police in securing evidence of the crime." *State v. McLeod*, 1 Ohio St.2d 60, 62, 203 N.E.2d 349, 351 (1964) (emphasis added). Again in *Beatty v. United States*, 389 U.S. 45 (1967) (per curiam) the Supreme Court summarily reversed citing *Massiah* despite the Court of Appeals' determination that "appellant voluntarily spoke of the weapon..... Appellant wanted to talk and he simply did just that." *Beatty v. United States*, 377 F.2d 181, 190 (5th Cir. 1967).

Nor is interrogation seeking to elicit incriminatory statements necessary. In the famous "Christian Burial Speech" case no direct interrogation occurred. Nonetheless the Court applied the exclusionary rule to the statements obtained by law enforcement who played upon the defendant's well-known religious beliefs in order to obtain his incriminating statement. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

Despite the consistency of the Supreme Court's holdings, however, one court observed that *Brewer* plunged the lower federal courts into a "percolating caldron of questions" concerning its meaning. *United States v. Carpenter*, 611 F.2d 113, 116 (5th Cir.) *cert. denied*, 447 U.S. 922, 100 S.Ct. 3013, 65 L.Ed.2d 1114 (1980). The court dispelled much of the confusion engendered by *Brewer* this last term in *United States v. Henry, supra*. In *Henry* the defendant was incarcerated in a city jail awaiting trial on bank robbery charges. Government agents contacted another inmate at the jail, Nich-

ols, who had acted as a government informer in the past and asked him to be alert to statements made by federal prisoners in the jail, especially Henry. Nichols testified at Henry's trial as to incriminating statements made by Henry. The Supreme Court relied on three factors in holding that the introduction of these statements violated the rule established in *Massiah*:

> First, Nichols was acting under instructions as a paid informant for the government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols.

*United States v. Henry, supra*, 100 S.Ct. at 2186.

Each of these factors was important. The first established that government action was involved. The second factor demonstrated that no knowing waiver had occurred and the third, that Henry was entitled to counsel.

The question of "deliberate elicitation" was also resolved in terms of the particular facts of the case. Thus the fact that both Nichols and Henry were apparently in the same boat was significant. That fact had led the Court of Appeals to determine, and the majority of the Supreme Court to accept, a finding that "the incriminating conversation between Henry and Nichols was facilitated by Nichols' conduct and apparent status as a person sharing a common plight." *Id.* at 2188–2189. Custody also was significant, not for *Miranda* purposes but because "confinement may bring into play subtle influences that will make [a defendant] particularly susceptible to the ploys of undercover agents." 100 S.Ct. at 2188. Finally, the government agent's testimony that he never intended "that Nichols would take affirmative steps to secure incriminating information," *id.* at 2187, was to no avail since the agents "must have known that such propinquity likely would lead to that result." *Id.*

■ From all of the above a rule for the application of *Massiah* emerges. In the absence of waiver, statements obtained by law enforcement or its agents pursuant to conduct designed to elicit such information and undertaken after formal indictment of the accused, may not be admitted to prove the guilt of the defendant at trial. Neither interrogation nor voluntariness (in the sense of lack of coercion) is relevant.

Before applying this legal standard to the facts of this case, I must first determine if an evidentiary hearing is required.

## THE NEED FOR AN EVIDENTIARY HEARING

■ Obviously when a proper showing is made, a district court is required to hold an evidentiary hearing to establish the "material facts not adequately developed at the State court hearing." 28 U.S.C. § 2254(d)(3). *See Townsend v. Sain*, 372 U.S. 293, 315–316, 83 S.Ct. 745, 758, 9 L.Ed.2d 770 (1963); *Pierce v. Cardwell*, 572 F.2d 1339, 1342 (9th Cir. 1978). In this case, however, a full evidentiary hearing was held prior to the second trial in connection with defendant's motion to suppress his confession. Although as I shall explain, *infra*, the trial court resolved the issues presented only under Fifth Amendment rather than Sixth Amendment standards, the facts surrounding the obtaining of the confession were fully explored. Moreover, both petitioner and respondent agree that the present record is adequate to develop the facts needed to resolve petitioner's Sixth Amendment Claims.[9] A district court may properly make additional findings of fact in a proceeding under Section 2254 so long as they do not conflict with the findings of fact made by the state court and are adequately supported by the record. *See Brewer v. Williams, supra,* 430 U.S. at 396· 397, 97 S.Ct. at 1238; *Jackson v. Fogg*, 589 F.2d 108, 111–112 (2d Cir. 1978). These

**9.** Both petitioner and respondent agree that only legal questions remain to be resolved in this proceeding. Petitioner also suggests that

findings may be made without an evidentiary hearing if the record before the court is sufficient for that purpose. *See Green v. Loggins*, 614 F.2d 219, 223–224 (9th Cir. 1980).

The sole witness at the suppression hearing was Captain Carter. I find however that giving full credit to Captain Carter's testimony, nonetheless defendant's Sixth Amendment rights were violated. Under the circumstances, no further evidentiary hearing is required.

## THE STATEMENTS WERE DELIBERATELY ELICITED

Two critical conversations between petitioner and Carter occurred. The first was petitioner's promise to "tell all" and the second was the confession.

Captain Carter described the first relevant interview as follows:

Q. Did he ever at any time during those six hours [of pretrial interviews] indicate any hesitancy, or reluctance, to discuss this case with you?

A. During our last interview on the 29th, he indicated a hesitancy . . . . . In making a statement that he had chosen at that time to go all the way, and the context of our conversation was such that I assumed this to be a hesitancy on his part, because I was trying to get· well, I was talking to him, seeing if he would admit what had occurred at that time.

Q. Now, at any time during any of the conversations, did he ever indicate to you that at the end of the trial, no matter what happened in the trial, he would tell you the truth about what happened at the campground?

·　　·　　·　　·　　·

A. That was on [sic] the interview of September the 28th.

the present whereabouts of Captain Carter are unknown.

Augmentation of Reporter's Transcript on Appeal (hereafter ART) at 8–9.[10]

Thus the promise to "tell the truth after the trial" was obtained from petitioner on September 28 while Captain Carter "was talking to him, seeing if he would admit what had occurred at that time." ART at 8. Captain Carter had no further contact with petitioner before his trial which began on November 16, 1972.

Captain Carter's testimony continues as follows:

Q. After the trial, did you arrange to have him brought to you?

A. [Y]es.

Q. Was this because he told you that after the trial he would tell you the truth?

A. That is correct.

. . . . .

Q. How long did [the meeting] last?

A. I can only approximate at this time. It was probably a fifteen to thirty minute conversation.

Q. Who did most of the talking during that conversation?

A. It was about half and half. It was a conversation, as opposed to an interrogation.

ART at 10.

Captain Carter variously described the interchange between himself and petitioner as "a conversation, as opposed to an interrogation" and "a narration" although "[n]o doubt there were questions asked, you know." ART at 10 & 17.

Q. [W]as it question and answer, or did he narrate what happened, or what?

A. It was a narration, based on his early conversation, and this was mentioned at the time, based on his earlier willingness to tell me what had happened at the campsite at the conclusion of the trial.

. . . . .

**10.** All of Captain Carter's testimony cited as ART was given in a pretrial hearing on petitioner's motion to suppress the confession.

Q. Anybody else present?

A. No, sir.

. . . . .

Q. Isn't it true you merely sat and discussed, is that correct?

A. That is correct.

Q. Did you ask any questions?

A. It was more of a conversation, as opposed to asking specific questions. No doubt there were questions asked, you know.

Q. Did you prompt some answers, or–

A. (Interposing) No.

Q. Like "What happened next?", or, "What did so and so do then?"

A. No, sir. His description of what did occur was very brief.

Q. During that [post trial] conversation did [petitioner] tell you who killed Oroville Scott?

. . . . .

A. He told me that he, himself, had killed Orville Scott.

Q. In connection with this you didn't give him any Miranda–type warnings, did you?

A. No, sir.

Q. Did you and Mr. Cahill discuss the idea you and I, or "we" might be here again today, as we are?

. . . . .

A. He indicated that–the statements made by him to me probably would not be admissible in a later trial.

. . . . .

Q. Just for the record, you didn't contact Mr. Cahill's attorney prior to discussing this with him?

A. No, sir.

ART at 10 & 17. Reporter's Trial Transcript (hereafter RT) at 291, 296–297 & 300.

■ The trial judge found that the statements were voluntary and "ha[d] a good deal of probability of truth." ART at 22–

23. He further found that petitioner's pre-trial promise to "tell all" after the trial was volunteered. *Id.* at 22. Thus the trial judge addressed petitioner's contentions in Fifth Amendment terms of voluntariness and did not reach petitioner's Sixth Amendment claims.[11] It is clear to me, however, that under these facts Captain Carter "deliberately elicited" petitioner's confession.

First, it must be remembered that petitioner was incarcerated. While custodial interrogation is the hallmark of *Miranda v. Arizona, supra* – a Fifth Amendment case – the Supreme Court has recently held that custody, although not required, can be an important factor in determining whether "deliberate elicitation" has taken place for Sixth Amendment purposes. *United States v. Henry, supra,* 100 S.Ct. at 2188 & n.11.

Second, petitioner had the very day before been convicted of first degree murder. A stronger example of circumstances which may subject an individual to "powerful psychological inducements to reach for aid" and pressures "the mere fact of custody imposes *United States v. Henry, supra,* at 2188, can scarcely be imagined. Third,

> There can be no serious doubt . . . that [Captain Carter] deliberately and designedly set out to elicit information from [petitioner] just as surely as – and perhaps more effectively than – if he had formally interrogated him. [Captain Carter] was fully aware . . . that [petitioner] was [represented by counsel]. Yet he purposely sought during [petitioner's] isolation from his lawyer[ ] to obtain as much incriminating information as possible.

*Brewer v. Williams, supra,* 430 U.S. at 399, 97 S.Ct. at 1239. Like Detective Leaming who elicited incriminating statements in *Brewer,* Captain Carter admitted as much at the hearing on petitioner's motion to suppress evidence and at petitioner's second trial.

Nonetheless respondent contends, and the California Court of Appeal held, that the rule established in *Massiah* has no application in the absence of interrogation.[12]

■ As I noted above, interrogation is simply not a Sixth Amendment ingredient. The Supreme Court has clearly held in recent cases that interrogation in the form of questioning is not required to trigger *Massiah* guarantees which are dependent upon the existence of a right to counsel rather than the form of elicitation. *See United States v. Henry, supra,* 100 S.Ct. at 2186 -2187. Rather, statements obtained when the government "intentionally creat[es] a situation likely to induce [a defendant] to make incriminating statements

11. At the motion to suppress, petitioner's primary attack on the confession was based on *Miranda v. Arizona, supra,* a Fifth Amendment case, although he did mention *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), a Sixth Amendment case. Although petitioner did not specifically cite *Massiah* at the motion to suppress, "[i]t [is] unnecessary for [the defendant] to cite to the state court book and verse on the federal constitution [when] the state court [has] been presented with all the operative facts giving rise to the asserted constitutional principle. . . ." *Daugharty v. Gladden,* 257 F.2d 750, 758 (9th Cir. 1958). *See Daniels v. Nelson,* 453 F.2d 340 (9th Cir. 1972). Further, even if *Massiah* were not properly raised at the trial level, raising the issue for the first time on appeal suffices to preserve the issue for federal habeas purposes, *see Lockett v. Blackburn,* 571 F.2d 309 (5th Cir.), *cert. denied,* 439 U.S. 873, 99 S.Ct. 207, 58 L.Ed.2d 186 (1978); *United States ex rel. Nelson v. Zelker,* 465 F.2d 1121 (2d Cir.), *cert. denied,* 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 497 (1972), and, in any event, the California Court of Appeal addressed the *Massiah* claim on the merits making review of this issue proper. *See Ulster County Court v. Allen,* 442 U.S. 140, 147 154, 99 S.Ct. 2213, 2219–2223, 60 L.Ed.2d 777 (1979); *Warden v. Hayden,* 387 U.S. 294, 297 n.3, 87 S.Ct. 1642, 1645 n.3, 18 L.Ed.2d 782 (1967); *Bradford v. Stone,* 594 F.2d 1294, 1296 n.2 (9th Cir. 1979).

12. Since the trial court made no findings concerning interrogation, the Court of Appeal made a finding of fact on this point – a finding of fact that is entitled to the presumption of correctness 28 U.S.C. § 2254 awards to facts found by a state trial court. *Sumner v. Mata,* U.S. , 101 S.Ct. 764, · L.Ed.2d ·· (1981). The Supreme Court's determination apparently overturns applicable Ninth Circuit law. *See Thomas v. Craven,* 473 F.2d 1235, 1236 (9th Cir. 1973) (per curiam); *Hill v. Nelson,* 466 F.2d 1346, 1348 (9th Cir. 1972) (per curiam). Under California law, a California court of appeal has no power to find facts in a criminal case tried to a jury. *See People v. Mendes,* 35 Cal.2d 537, 546, 219 P.2d 1 (1950); Cal.Const. Art. VI, § 11; Cal.Civ.Proc.Code § 909.

. . . ," 100 S.Ct. at 2189, must be suppressed if taken after indictment absent a waiver of the presence of counsel. Indeed if anything, the trial court's finding "that [petitioner] offered to bare his soul after the trial, no matter what happened," ART at 22, buttresses this court's finding that the statements were deliberately elicited within the meaning of *Massiah, Brewer,* and *Henry.*

The Court of Appeal relied on the trial court's holding to find that petitioner's statements were "volunteered" for *Miranda* purposes. Even conceding, however, that petitioner's agreement to "tell all" after the trial was volunteered, petitioner did not, however, "volunteer" the keeping of his promise. Captain Carter "[e]ither [ ] arranged for [petitioner] to be brought upstairs to the detective division, or . . . went to the jail division and brought him back upstairs . . . based on [petitioner's] willingness to tell me what had happened at the campground" and engaged him in "a conversation, as opposed to an interrogation." ART at 10.

In any event the voluntary nature of defendant's statements is simply not relevant for Sixth Amendment purposes. The issue is whether the government undertook activities which had as their purpose the eliciting of incriminating statements. Under no circumstances can it be said that petitioner "volunteered" his presence in Captain Carter's office on the day after trial.[13]

Petitioner's incarceration and conviction were events that would have occurred regardless of Captain Carter's actions. Those events alone do not establish deliberate elicitation. Captain Carter, however, deliberately took advantage of the situation by transferring petitioner to his office shortly after the jury's verdict for the express purpose of having petitioner fulfill his pretrial promise. Indeed, if Captain Carter had not

said a word before or during the meeting, it could reasonably be said that petitioner's statements were "deliberately elicited" given the circumstances surrounding the meeting. The fact that Captain Carter and petitioner engaged in conversations is yet another reason to hold that the confession was "deliberately elicited." *Massiah* requires that such a statement be suppressed absent a waiver of the right to counsel.

## WAIVER

Respondent argues that petitioner waived his Sixth Amendment rights when he promised to "tell all" during the pretrial conversation with Captain Carter which occurred some fifty-four days before his confession. The trial judge found only that petitioner waived his *Fifth* Amendment rights at the pretrial conversation and by testifying at his first trial. ART at 24.

■■■ Once again respondent seeks to apply Fifth Amendment doctrine to a Sixth Amendment question. An individual may waive his Fifth Amendment privilege against self–incrimination by speaking if that speech is not prompted by "custodial interrogation." *See Miranda v. Arizona, supra,* 384 U.S. at 478, 86 S.Ct. at 1629. Waiver of a Sixth Amendment right to counsel, however, must be established by proof of an "intentional relinquishment or abandonment of a known right or privilege." *Brewer v. Williams, supra,* 430 U.S. at 404, 97 S.Ct. at 1242 *quoting Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

The record would support a finding that petitioner waived his right to the presence of counsel on September 27 with the knowledge that any statements he made *at that time* could be used against him. Petitioner was formally indicted by the grand jury on the following day and was entitled to counsel to advise him regarding his Fifth

---

**13.** "Voluntary" or "volunteered" statements must be distinguished from statements that are truly spontaneous. If, for example, Captain Carter had been walking through the cellblock and petitioner had yelled out a confession as he passed, that confession would be truly sponta-

neous and admissible in evidence. The state makes no claim of spontaneity and, given the fact that petitioner was taken to Captain Carter's office for the purpose of obtaining statements, is simply precluded from making such a claim.

Amendment rights *and* to aid him in preparing a defense, a Sixth Amendment right to counsel. When Captain Carter questioned petitioner on September 28, he did not inform petitioner of his right to the presence of counsel during interrogation. Assuming petitioner was aware of his right to the presence of counsel at the September 28 interview, there is not one shred of evidence suggesting that petitioner was ever informed of, or aware of, his right to the presence of counsel during any *post trial* interviews. Any possible inference that petitioner proceeded to speak with Captain Carter after the trial with full knowledge of his right to an attorney or of the consequences of his acts is dispelled by petitioner's observation during the interview "indicat[ing] that–the statements made by him to me [Captain Carter] probably would not be admissible in a later trial." RT at 297. Aside from the fact that petitioner's misapprehension shows the very need for counsel that *Massiah* seeks to protect, there is simply nothing in the record before this court that demonstrates that petitioner was aware of his rights during the post trial interview.

Moreover, even if I were to assume that petitioner knew that he had a right to the presence of counsel at the post trial interview, the record is barren of any evidence showing an intentional relinquishment of that right. In a Sixth Amendment context, "[p]resuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." *Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962).

 The only evidence from which a relinquishment of the right to counsel may be inferred is petitioner's promise "to bear his soul to Mr. Carter after the trial, no matter what happened," ART at 22, and his subsequent confession. *Brewer v. Williams, supra,* makes clear that these two facts alone are insufficient to support a waiver.

In *Brewer,* the Court found that the defendant was aware of his right to counsel when he made incriminating statements. Williams had previously consulted with two attorneys, yet promised that "[w]hen I get to Des Moines and see [my attorney], I am going to tell you the whole story." 430 U.S. at 392, 97 S.Ct. at 1236. Here, even assuming petitioner was aware of his right to counsel during his pretrial interviews with Captain Carter, there simply is no evidence of his awareness of a right to counsel at the time of his confession. Clearly, his awareness of his right to counsel at the pretrial conference is not dispositive since he was not only aware of his rights, but affirmatively expressed his desire for counsel. At that conference petitioner stated "that he did not want [the public defender] to represent him. That he wanted other–possibly two other attorneys." ART at 16. As in *Brewer,* the confession alone cannot establish a waiver of petitioner's Sixth Amendment rights.

> Despite Williams' express and implicit assertions of his right to counsel, Detective Leaming proceeded to elicit incriminating statements from Williams. Leaming did not preface this effort by telling Williams that he had a right to the presence of a lawyer, and made no effort at all to ascertain whether Williams wished to relinquish that right. The circumstances of record in this case thus provide no reasonable basis for finding that Williams waived his right to the assistance of counsel.

*Brewer v. Williams, supra,* 430 U.S. at 405, 97 S.Ct. at 1242.

In the case at bar, Captain Carter did not inform petitioner of his right to counsel before the post trial interview and there is nothing in the record to show, assuming Captain Carter thought petitioner knew of his rights at that time, that Captain Carter inquired into the possibility of a waiver of that right.

I therefore conclude that respondent has failed to meet its burden of establishing a waiver of petitioner's Sixth Amendment rights and that his post trial confession was

used against him at his second trial in violation of his Sixth Amendment right to the assistance of counsel.[14]

Petitioner's final contention is that the prosecutor improperly commented on his post–arrest silence in violation of his Fourteenth Amendment right to due process of law.

## PROSECUTORIAL COMMENT

The prosecutor elicited the following testimony from the arresting officer without objection:

Q. Did you advise [petitioner] of what you were arresting him [sic]?

A. Yes, sir.

Q. What did you tell him?

A. I told him he was under .arrest for suspicion of murder.

Q. Did he make any response at all?

A. He said very little.

Q. Did he ever inquire as to the nature of the charge or who was supposed to be the victim, or where it was supposed to have happened, or anything of that nature?

A. No, sir.

RT at 156–57.

In his argument to the jury, the prosecutor stated:

At the arrest scene by Officer Whitesides [sic], he [petitioner] was informed of this murder charge. No reaction. No incredulous "What?," no "Who is suppos-

ed to have been murdered?" "My gosh, there has been a terrible mistake." Nothing. Strongly consistent with the fact he already knew exactly what had happened, and he had done exactly what Mr. Whitecotton testified to.

ART at 17.[15]

■ Respondent admits that this comment was error, see Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976);[16] Alo v. Olim, 639 F.2d 466 (9th Cir. 1980), but contends that this error was harmless beyond a reasonable doubt.[17] Given my conclusion that petitioner's confession was improperly admitted in evidence and respondent's admission that the prosecutor's comment was error, I need not address the question of whether or not either of these errors standing alone would constitute harmless error. The only substantial evidence of guilt that was properly admitted was the testimony of the eyewitness/accessory after the fact, Alton Whitecotton. Although the uncorroborated testimony of an accomplice can support a conviction, see Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917); United States v. Sigal, 572 F.2d 1320 (9th Cir. 1978), I cannot say that the admission of a confession obtained in violation of petitioner's constitutional rights and prosecutorial comment violative of due process were, in combination, harmless beyond a reasonable doubt in the present case. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

14. In light of this determination, there is no reason to reach petitioner's contention that the statement should have been excluded on Fifth Amendment grounds.

15. Although petitioner's counsel did not object to the questions and answers or the remarks of the prosecutor in his closing argument, the trial court, in ruling on a motion for a new trial, held that the prosecutorial misconduct could not have been cured by a timely admonition. People v. Cahill, 3 Crim. 8082 (Mar. 14, 1978) (unpublished opinion). The Court of Appeal accordingly addressed petitioner's claim of error on the merits. See, e. g., People v. Green, 27 Cal.3d 1, 28, 164 Cal.Rptr. 1, 609 P.2d 468 (1980).

16. Neither party to this proceeding discusses the retroactive application of Doyle although

petitioner was convicted before Doyle was decided. I note that the Ninth Circuit has held that there is no retroactivity question given the facts of the present case since the rule announced in Doyle has been applied in the Ninth Circuit since 1969 (Fowle v. United States, 410 F.2d 48 (9th Cir. 1969)) and in California since 1965 (People v. Cockrell, 63 Cal.2d 659, 47 Cal.Rptr. 788, 408 P.2d 116 (1965)). See Bradford v. Stone, 594 F.2d 1294, 1296 n.1 (9th Cir. 1979).

17. The harmless error standard applies to both Massiah error, Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), and Doyle error. See Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980).

**1232**

The petition for a writ of habeas corpus is granted. California shall retry petitioner within ninety (90) days or he shall be released from custody.

IT IS SO ORDERED.