PEOPLE v RIGGS

Docket No. 178918. Submitted May 23, 1996, at Detroit. Decided May 30,
1997, at 9:00 A.M. Leave to appeal sought.

Toni C. Riggs was convicted in the Recorder's Court of Detroit, Gersh-
win A. Drain, J., of first-degree murder and conspiracy to commit
murder. Before trial, the defendant had moved to suppress as evi-
dence a videotape of a conversation that she had had with a federal
Drug Enforcement Administration agent in which she had made
admissions concerning the fact that she and her brother had
planned to kill her husband for financial gain and had carried out
that plan. At the time that the defendant made those admissions to
the federal agent in response to questions posed by the agent, she
believed the agent to be an individual involved in the illegal drug
trade and had met with the agent after expressing an interest in
becoming involved in the illegal drug trade. The motion to suppress
the videotape as evidence was based on the claim that it had been
obtained in violation of the defendant's right to counsel under US
Const, Am VI, and Const 1963, art 1, § 20, by reason of the fact that
at the time the conversation with the federal agent took place there
was pending in the Court of Appeals an appeal by the prosecution
of the dismissal at the preliminary examination of prior charges of
murder and possession of a firearm during the commission of a fel-
ony that arose out of the death of the defendant's husband. The
defendant argued that because she had been represented by coun-
sel at the proceedings concerning the prior charges, her constitu-
tional right to counsel remained at the time of her conversation
with the federal undercover agent and that the statements made in
response to the questions of the federal agent, secured without her
being afforded benefit of counsel, violated her constitutional right
to counsel. The court denied the motion to suppress, holding that
although the defendant had a constitutional right to counsel at the
time she made the admissions to the federal agent, the constitu-
tional "right to counsel does not and should not protect defendants
who are engaged in or alleged to be engaged in continuing criminal
conduct." The court also permitted, over a defense objection, the
deceased's mother to read a letter that she received from the
deceased shortly before he was killed in which he wrote of marital

discord that existed in his marriage with the defendant. The defendant appealed.

The Court of Appeals *held*:

Because the previous charges were dismissed pursuant to a judicial determination that the state lacked probable cause to proceed against the defendant and that determination was ultimately affirmed so that the prosecution could not reinstate those charges but rather had to recharge the defendant, the defendant's Sixth Amendment right to counsel was not violated during the conversation between the undercover federal agent and the defendant in which the defendant made admissions in response to questions posed by the agent, notwithstanding the fact that an appeal by the prosecution of the dismissal of the prior murder and conspiracy charges was pending in the Court of Appeals at the time the defendant made those admissions. Further, any error in the admission into evidence of the contents of the letter from the deceased to his mother was harmless.

SMOLENSKI, J., stated that the Sixth Amendment right to counsel does not extend indefinitely into the future after the initial charge is dismissed. Here the initial charges were dismissed by the action of the district court, and the dismissal of those charges was affirmed both by the Recorder's Court and the Court of Appeals. Unlike those federal cases in which the dismissals of the initial charges were by the prosecution, thereby rendering it possible for the prosecution by its dismissal of charges to attempt to defeat the application of the Sixth Amendment to a subsequently secured statement, the dismissal of charges in this case was by a court and against the wishes of the prosecution. Further, although the federal agent was aware of the state prosecution and had had contact with the state authorities who were investigating the murder, the trial court found, and the record supports, that the federal agent was at the time of the questioning of the defendant regarding the murder pursuing a genuine and legitimate federal narcotics investigation that was independent of the state murder investigation. Because there were no charges pending against the defendant at the time that she made the incriminating statements to the federal narcotics officer, the Sixth Amendment right to counsel did not preclude the use of those statements at the trial of these subsequently brought charges.

The trial court did not err in allowing a letter written by the deceased to his mother shortly before he was killed to be read into the record for the purpose of showing the existence of marital discord and thereby to show the defendant's motive. To the extent that the admission of the contents of the letter was error because it

created sympathy toward the deceased and his mother, the error was harmless.

WHITE, P.J., concurring, stated that under the circumstances of this case there was no violation of the Sixth Amendment right to counsel and that any error in the admission of the contents of the letter written by the deceased was harmless.

Affirmed.

R. R. LAMB, J., dissenting, stated that the trial court erred in failing to suppress the statements made to the federal agent concerning the murder and conspiracy to murder the defendant's husband made in response to the federal agent's questions, because the Sixth Amendment right to counsel continues after a charge has been dismissed with respect to any interrogation concerning the substance of the dismissed charge where the interrogation occurs during the pendency of an appeal of the dismissed charge and extends to any interrogation by any police agency that is aware of the dismissed charge. Further, although the trial court properly permitted the reading of those portions of the letter of the deceased pertaining to the fact that there had been marital discord, it was error to permit the reading of the remaining portions of the letter that were irrelevant to any material issue and were more prejudicial than probative. The defendant's conviction should be reversed, and the matter should be remanded for a new trial.

CRIMINAL LAW — RIGHT TO COUNSEL — DISMISSAL OF CHARGES.

A defendant's Sixth Amendment right to counsel is not violated where during a federal narcotics investigation that takes place following the judicial dismissal of state criminal charges for lack of probable cause and during the pendency of the prosecution's appeal of that dismissal of the state charges the defendant makes admissions concerning the state offense underlying the dismissed charges in response to questions posed by a federal undercover agent and the dismissal of the charges is ultimately affirmed; the admissions made by the defendant to the federal agent may be used at the trial of subsequently brought state charges (US Const, Am VI).

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief of Research, Training, and Appeals, and *Jeffrey Caminsky*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Ronald J. Bretz* and *Lyle N. Marshall*), for the defendant on appeal.

Before: WHITE, P.J., and SMOLENSKI and R. R. LAMB*, JJ.

SMOLENSKI, J. Defendant was convicted of first-degree premeditated murder, MCL 750.316; MSA 28.548, and conspiracy to commit murder, MCL 750.157a; MSA 28.354(1). Defendant was sentenced to concurrent terms of life in prison without parole. Defendant appeals as of right. We affirm.

Because of the significance of the constitutional issue presented in this case, our recitation of the facts is necessarily detailed. In March 1991, defendant's husband, Army Specialist Anthony Riggs, was shot to death in Detroit shortly after his return from the Gulf War. Defendant retained an attorney, who represented her at her April 1991 preliminary examination of charges of first-degree premeditated murder and possession of a firearm during the commission of a felony in connection with her husband's murder. At the preliminary examination, the district court found that insufficient evidence had been presented with regard to the elements of first-degree murder and, accordingly, determined that there was not probable cause to bind over defendant to the Recorder's Court for trial on either charge. The district court dismissed the case against defendant and denied the prosecutor's motion for a stay of execution of the order of dismissal with a personal bond pending an appeal. The district court discharged defendant. See MCR 6.110(F). The prosecutor appealed to the Recorder's

---

* Circuit judge, sitting on the Court of Appeals by assignment.

Court, arguing that the district court erred in refusing to consider certain evidence against the defendant.[1] In June, 1991, the Recorder's Court affirmed the district court's decision.[2] In July 1991, the prosecution applied for leave to appeal to this Court.

In April 1992, while the prosecution's appeal of the district court's decision was pending in this Court and defendant continued to be represented by her retained counsel, defendant traveled from Michigan to Texas, where she associated with a man named Reggie and a woman named Rosita. At this time, Reggie and Rosita engaged in an illegal drug transaction (the Texas drug transaction). As a result of her association with the Texas drug transaction and its participants, defendant became the target of an undercover drug investigation into the Colombian drug cartel Cali that was being conducted by the United States Drug Enforcement Administration (DEA). On February, 23, 1993, and while the prosecution's appeal of the district court's decision was still pending in this Court, defendant met in Detroit with two persons she believed to be high-level narcotics dealers to discuss the Texas transaction and various jobs that she could perform for their supposed narcotics organization. The supposed dealers were, in reality, DEA special agent Richard Crock and his partner, Joseph Peterson. During this meeting, which was videotaped by the federal agents, defendant detailed her involvement in her husband's killing.

Crock, who had been attempting to conduct a long-term undercover investigation that was to end

---

[1] See *People v Riggs*, unpublished opinion per curiam of the Court of Appeals, issued May 26, 1993 (Docket No. 142280).

[2] See note 1, *supra*.

shortly, periodically stayed in touch with defendant via face-to-face meetings, which were videotaped, and telephone contacts, which were recorded, during 1993. On May 26, 1993, this Court issued its opinion affirming the district court's suppression of evidence and determination that insufficient other evidence existed to bind over defendant for trial.[3] In June 1993, the prosecution filed with our Supreme Court an application for leave to appeal this Court's affirmance of the district court's decision. On November 17, 1993, and while the prosecution's appeal was still pending in our Supreme Court, defendant was arrested by Crock and other DEA agents pursuant to an arrest warrant for federal narcotics violations and was taken to DEA lockup facilities in Detroit. Defendant was brought to a conference room in which were Crock and Sergeant William Rice of the Detroit Police Department. Rice was the officer in charge of the state investigation into the murder of defendant's husband. Crock played a portion of the videotape of his February, 23, 1993, meeting with defendant during which defendant detailed her involvement in her husband's killing and then left the room. Rice interviewed defendant and obtained an additional statement from defendant. On November 30, 1993, our Supreme Court denied the prosecution's application for leave to appeal.

A state complaint was issued in which defendant was charged, in part, with first-degree premeditated murder and conspiracy to commit murder. Defendant's preliminary examination was held on December 14 and 15, 1993. DEA agent Crock was the only wit-

---

[3] See note 1, *supra.*

ness called to testify. His testimony concerning defendant's statements was received following the district court's denial of defendant's motion to suppress such testimony on the ground that it had been obtained in violation of defendant's Sixth Amendment right to counsel. Crock's testimony may be summarized as follows. Beginning in spring 1992, Crock had been coordinating an investigation into the Cali drug cartel as a member of a task force made up of DEA agents and members of state and local agencies. Defendant had not been a target of this investigation at its very beginning, but rather had become a target only after she became associated with the April 1992 Texas drug transaction. At some point, a DEA agent in Texas, as part of the "investigation run" from the DEA's Tyler, Texas, office, made initial contact with Rice concerning the exact status of Reggie (the man with whom defendant became involved in the Texas drug transaction) and provided Rice with information concerning Reggie. Crock did not direct that this information be given to Rice.

Crock first had contact with Rice in 1986. Concerning defendant, Crock contacted Rice in April 1992, after defendant had become involved in the Texas transaction. At that time, Crock became aware of who defendant was, that homicide charges had been brought against defendant in a state court, and that Rice was still investigating defendant. Crock's understanding of the exact nature of the legal proceedings against defendant in April 1992 was only that there had been a dismissal. Crock related to Rice "the specifics going back to April of '92" concerning any possible involvement by defendant with Reggie.

Crock had no contact with defendant after April 1992 until early 1993 when he recruited a new confidential informant who was able to contact defendant. This confidential informant was working with Crock on the Texas transaction. Crock, the confidential informant, and Crock's partner, Joseph Peterson, tried unsuccessfully to contact defendant by telephone several days before February 23, 1993. However, no contact was made with defendant before February 23, 1993, when Peterson was finally able to arrange by telephone the February 23, 1993, meeting with defendant.

Rice apparently traveled to Texas in January 1993 and obtained statements from Reggie and Rosita. Rice did not undertake to travel to Texas on the basis of any information provided by Crock. Crock knew of Rice's investigation, but he was not made aware until after his February 23, 1993, meeting with defendant that Rice had obtained statements in Texas. Crock had still not seen the statements obtained by Rice at the time of defendant's December 14, 1993, preliminary examination.

Although Crock's testimony is not entirely clear in this regard, it appears that Crock contacted Rice either the day before or the day of the February 23 meeting because "at that point in the investigation we could formulate plans to meet with" defendant. This contact occurred before Peterson contacted defendant by telephone and arranged the February 23, 1993, meeting.

Crock, in his undercover role as a high-level narcotics dealer, thus met in Detroit with defendant on February, 23, 1993. Crock had information that defendant wanted to be involved in this meeting. Rice was not

in the vicinity of this meeting. The meeting began with Peterson introducing defendant to Crock and indicating that defendant was the person involved in the April 1992 Texas drug transaction. Crock asked defendant to explain what had happened in Texas so that he could assess the situation because the rules of his organization had been violated during this transaction. As part of their discussion concerning the Texas transaction, Crock and defendant discussed Reggie. Defendant brought up the fact that she was concerned that Reggie was going to turn state's evidence against her in the murder case. The conversation concerning the Texas transaction lasted over ninety minutes. After discussing defendant's involvement in the Texas drug transaction, the conversation turned to defendant's suitability for jobs in the drug trade as a drug or money courier. Crock also learned that defendant had some money that she wanted to invest. At some point in the conversation, defendant told Crock about the appeal and that she was represented by counsel.

After defendant indicated that she was interested in being involved in the drug trade, Crock told her that before they could put her to work they had to address some concerns they had with her past. Crock then turned the discussion to the homicide in the context that he was trying to rectify problems that a confidential informant would be having because of Reggie's cooperation and that defendant needed to tell him what had happened if she wanted his help. When Crock indicated that he had to know defendant's history and background, defendant was hesitant at first. Initially, defendant stated that she had nothing to do with the homicide. Crock told her that this story

"didn't add up . . . ." At some point, Crock listened by
way of telephone extension to a telephone conversa-
tion defendant had with a confidential source that
defendant had identified as being involved in the drug
trade. This telephone conversation lasted less than
two minutes and had been preplanned by Crock
because "we wanted to be in a position to discuss the
homicide." After this telephone conversation, defend-
ant indicated that she had formulated a plan with her
brother to murder her husband for financial gain.
Defendant provided Crock with the details of how
this plan evolved and was executed. Crock met with
Rice within twenty-four hours after the February 23,
1993, meeting.

Crock's primary purpose in meeting with defendant
on February 23, 1993, was to further and expand his
drug investigation into the Texas transaction, which
involved persons he was investigating in the Cali car-
tel as well as some of his own confidential infor-
mants. At that point, Crock did not have a
"prosecutable case" against defendant concerning
"her involvement in the Texas transaction," but
through the undercover contact, he was hoping to
generate such a case.

Although not a primary goal, another goal of the
meeting was to get defendant to make some state-
ment about the homicide. Crock's job as a DEA agent
was to investigate any felony arising out of any of his
investigations. The meeting was preplanned, and
Crock was there that day to put everything in a posi-
tion where defendant would discuss the homicide.
Crock arranged to have his February 23, 1993, discus-
sion with defendant videotaped. Crock's conversation
with defendant concerning the homicide had nothing

to do with his drug investigation but concerned the homicide with which Crock was trying to help Rice. Crock denied that he and Rice had a prearranged plan to question defendant concerning the murder of her husband.[4] Specifically, when defense counsel asked "Wasn't Sgt. Rice calling you saying, hey, man, see

---

[4] In this regard, the following exchanges occurred during Crock's cross-examination:

> Q. [Defense Counsel] Okay. And at this point you and Sgt. Rice spoke, and you were acting as an agent on behalf of the Detroit Police Department on behalf of Sgt. Rice, and you agreed to question Ms. Riggs over this homicide, and you had set it up so she could be tape recorded; right?
>
> A. [Crock] I don't know if I could answer that the way you phrased it.

> \* \* \*

> Q. Oh, my question, sir, was simply that you and Sgt. Rice had formulated a plan that you would get Ms. Riggs to confess to what happened in the homicide?
>
> A. I don't think that is accurate.
>
> Q. Okay, when you and Sgt. Rice planned this meeting, is that correct, discussed this meeting?
>
> A. Discussed, yes.
>
> Q. Discussed the meeting, and you were going to be meeting with her, and he wanted to find out about the homicide right?
>
> A. I don't think anybody felt that was a real option at that point.
>
> Q. I'm sorry.
>
> A. I don't feel anyone believed that was an option at that point.
>
> Q. You wanted to be in a position—is what I have here of your discussion—you preplanned it, you wanted everything to be in a position where she would discuss the homicide. Those are your words. I wrote them down in quotes. Were they not, sir?
>
> A. Yes.
>
> Q. And that is what you were doing there that day?
>
> A. Yes.

> \* \* \*

> Q. Sir, what you told now is that this questioning involving her husband's homicide had nothing, absolutely nothing, to do with your drug investigation; right?
>
> A. That's correct, yes.

what you can do if you can hook up with Riggs, and then see if we can get her to say something; right?" Crock replied "No." Finally, Crock testified that at the time of defendant's preliminary examination, charges arising out of the April 1992 Texas transaction were pending against defendant in the federal court.

Following Crock's testimony, defendant was bound over to Recorder's Court for trial on the murder and conspiracy charges. Defendant thereafter moved in the Recorder's Court to suppress certain evidence, including suppression of her statements to Crock on the basis of a violation of the Sixth Amendment, US Const, Am VI, and Const 1963, art 1, § 20. A hearing was held at which Rice, Crock, and defendant testified concerning a Fifth Amendment claim raised by defendant. As relevant to defendant's Sixth Amendment claim, Crock testified at this hearing that Detroit police officers were assigned to his state and local task force, but that none of these officers were involved with the investigation of the murder of defendant's husband.

The Recorder's Court refused to suppress defendant's statements to Crock concerning her husband's murder. The court found that defendant had had a right to counsel under the Sixth Amendment and Const 1963, art 1, § 20 at the time she was questioned by Crock in his undercover capacity pursuant to *People v Gonyea*, 421 Mich 462; 365 NW2d 136 (1985).

---

*Q.* And that you were asking those questions because you and Sgt. Rice had a pre-arranged plan to get her to talk about the homicide on tape; is that right? That is what you told us before, isn't it, sir?
*A.* No, I don't believe I did.

However, the court concluded that Crock's questioning had not violated these rights:

> As this court looks back to the instant case it concludes that none of the cases cited by defendant is on point or analogous. *Massiah* [*v United States*, 377 US 201; 84 S Ct 1199; 12 L Ed 2d 246 (1964)] and [*Maine v Moulton*, 474 US 159; 106 S Ct 477; 88 L Ed 2d 481 (1985)] both involved law enforcement officers getting co-defendants to cooperate against defendants during the trial phase of the case, which we don't have here. Additionally, [*United States v Henry*, 447 US 264; 100 S Ct 2183; 65 L Ed 2d 115 (1980)] involves a situation where an informant on the defendant's cellblock cooperates against the defendant for pay.
>
> The instant case is a far cry from the cases cited above where the right to counsel was deliberately interfered with by law enforcement officer [sic] who planted people to elicit incriminating statements.
>
> Here we have a separate and distinct ongoing federal narcotic investigation which the DEA was genuinely and legitimately pursuing, totally independent of the state homicide case.
>
> This court is satisfied that the narcotics investigation was not a ruse, artifice or subterfuge to get at the defendant. Nor was it generated for the purpose of eliciting incriminating statements from the defendant.
>
> This court believes that the Sixth Amendment and Art I, Sect. 20 right to counsel does not and should not protect defendants who are engaged in or alleged to be engaged in continuing criminal conduct.
>
> Therefore, the Court will deny the motion to suppress the videotapes and the defendant's conversations with Agent Crock.

The trial court subsequently denied defendant's motion for reconsideration of its suppression ruling. During defendant's trial on the murder and conspiracy charges, the video and audio tapes of defendant's conversations with Crock, including the videotape of the

February, 23, 1993, meeting wherein defendant detailed her involvement in her husband's murder, were played for the jury. In addition, Lessie Riggs, the mother of Anthony Riggs, was permitted to read, over defense counsel's objection, the last letter Anthony Riggs wrote to her before he returned home from the Gulf War. Defendant was convicted as charged and sentenced. This appeal ensued.

On appeal, defendant premises her first argument entirely on the Sixth Amendment, i.e., defendant argues that admitting into evidence the incriminating statements she made to Crock concerning her husband's murder violated her Sixth Amendment right to counsel.

Where federal questions are involved, the Court of Appeals is bound to follow the prevailing opinions of the United States Supreme Court. *Betty v Brooks & Perkins*, 446 Mich 270, 276; 521 NW2d 518 (1994). Moreover, Michigan adheres to the rule that a state court is bound by the authoritative holdings of federal courts regarding federal questions when there is no conflict. *Young v Young*, 211 Mich App 446, 450; 536 NW2d 254 (1995); *Kocsis v Pierce*, 192 Mich App 92, 98; 480 NW2d 598 (1991). However, where an issue has divided the circuits of the federal court of appeals, this Court is free to choose the most appropriate view. *Young, supra.*

A trial court's decision following a suppression hearing generally will not be reversed unless it is clearly erroneous. *People v Houstina*, 216 Mich App 70, 73; 549 NW2d 11 (1996). Although the trial court's resolution of a factual issue is entitled to deference, particularly when witness credibility is involved, where the claimed error involves the alleged depriva-

tion of a constitutional right, the determination of the
Court of Appeals of the issue is guided but not con-
trolled by the trial court's factual determination. *Peo-
ple v Burrell,* 417 Mich 439, 449; 339 NW2d 403
(1983); see also *People v Nelson,* 443 Mich 626, 631,
n 7; 505 NW2d 266 (1993).

The Sixth Amendment, as applied to the states
through the Fourteenth Amendment, guarantees that
"[i]n all criminal prosecutions, the accused shall enjoy
the right . ... to have the Assistance of Counsel for his
defence." The essence of the Sixth Amendment right
is the opportunity for a defendant to consult with an
attorney and to have an attorney investigate the case
and prepare a defense for trial. *Michigan v Harvey,*
494 US 344; 110 S Ct 1176; 108 L Ed 2d 293 (1990);
*Moran v Burbine,* 475 US 412, 430; 106 S Ct 1135; 89
L Ed 2d 410 (1986). The remedy for a violation of the
Sixth Amendment right to counsel is suppression of
the evidence obtained in violation of the right. *People
v Anderson (After Remand),* 446 Mich 392, 404; 521
NW2d 538 (1994).

The Sixth Amendment right to counsel does not
attach until a prosecution is commenced, that is until
the initiation of adversary criminal proceedings by a
formal charge, a preliminary hearing, an indictment,
an information, or an arraignment. *McNeil v Wiscon-
sin,* 501 US 171, 175; 111 S Ct 2204; 115 L Ed 2d 158
(1991); *Anderson, supra* at 402. As explained by the
Supreme Court in *United States v Gouveia,* 467 US
180, 189; 104 S Ct 2292; 81 L Ed 2d 146 (1984):

> Thus, given the plain language of the Amendment and its
> purpose of protecting the unaided layman at critical con-
> frontations with his adversary, our conclusion that the right
> to counsel attaches at the initiation of adversary judicial

criminal proceedings "is far from a mere formalism." *Kirby v Illinois* [406 US 682, 689; 92 S Ct 1877; 32 L Ed 2d 411 (1972)]. It is only at that time "that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Ibid.*

Accordingly, without the initiation of formal charges, the possibility that a pretrial proceeding may have important consequences at trial, standing alone, is insufficient to trigger the Sixth Amendment right to counsel. *Moran, supra* at 431-432.

The right is offense specific. *McNeil, supra; People v Smielewski,* 214 Mich App 55, 60; 542 NW2d 293 (1995). Once the right has attached and been asserted by the accused, the Sixth Amendment provides a right to counsel at "critical stages" of the proceedings. *Michigan v Jackson,* 475 US 625, 632, n 5; 106 S Ct 1404; 89 L Ed 2d 631 (1986); *Moulton, supra* at 170; *Anderson, supra.* A critical stage of the proceedings includes government efforts to elicit information from the accused concerning the charged crime. *Jackson, supra* at 630; *McNeil, supra* at 175-176. Thus, once the right has attached and been invoked by the accused, any waiver of the right during a subsequent police-initiated custodial interrogation concerning the charged crime is ineffective. *McNeil, supra* at 175; *Anderson, supra.*

In this case, defendant relies on *Moulton, Henry,* and *Massiah,* a trilogy of cases holding that once the right to counsel has attached and been invoked the police may not deliberately elicit incriminating statements from the accused through the use of an under-

cover informant,[5] for support of her argument that her statements to Crock were obtained in violation of her Sixth Amendment right to counsel. In *Moulton, supra* at 162, the defendant and his codefendant were indicted in a Maine court for four theft-by-receiving offenses involving, in part, a Ford pickup truck, a Chevrolet dump truck, and Ford automotive parts. Following their entry of pleas of not guilty where they were represented by counsel, they were released on bail. *Id.* Approximately 1½ years later, the codefendant met with the defendant while wearing a recording device pursuant to a deal the codefendant had struck with the Maine police. *Id.* at 163-166. During the meeting, the defendant incriminated himself in the charged crimes pursuant to the codefendant's repeated requests to be reminded of the details of the crimes because of his (the codefendant's) poor memory. *Id.*

The defendant's pending indictments were subsequently dismissed and new indictments were issued against the defendant that realleged the pending charges and added additional charges, including burglary. *Id.* at 167. Following the trial court's denial of the defendant's motion to suppress, the state offered at trial the portions of the tapes of the meeting between the defendant and the codefendant involving their discussion of the thefts for which the defendant had been originally indicted. *Id.* The trial court found the defendant guilty "of burglary and theft in connection with the Ford pickup truck, the Chevrolet dump

---

[5] Moreover, the concept of a knowing and voluntary waiver of the Sixth Amendment right to counsel does not apply in the context of communications with an undisclosed informant acting for the government. *Henry, supra* at 273.

truck, and the Ford automotive parts." *Id.* The defendant appealed on the ground that his statements to the codefendant were admitted into evidence in violation of his Sixth Amendment right to counsel. *Id.* The Supreme Judicial Court of Maine agreed, holding that the defendant's incriminating statements concerning the charges for which his right to counsel had already attached should have been ruled inadmissible at trial. *Id.* at 168. The court remanded for a new trial. *Id.* at 167.

The United States Supreme Court granted the state's petition for certiorari and affirmed the decision of the Supreme Judicial Court of Maine. *Id.* at 168, 180. The Court held that incriminating statements concerning pending charges are inadmissible at the trial of such charges if the state, in obtaining the evidence, knowingly circumvents that accused's right to have counsel present in a confrontation between the accused and a state agent. *Id.* at 176, 180. The Court concluded that the state knowingly circumvented, and therefore violated, the defendant's Sixth Amendment right to counsel where the Maine police arranged to record conversations between the defendant and its undercover informant (the codefendant) without the presence of the defendant's counsel. *Id.* The Court reasoned that the identity of the party instigating the meeting at which the state obtains incriminating statements is irrelevant. *Id.* at 175. In response to the state's contention that the defendant's statements should not be suppressed because the Maine police had had other, legitimate reasons for listening to the conversation between the defendant and the codefendant, i.e., to investigate the defendant's alleged plan to kill a witness and to ensure the codefendant's

safety, the Court further reasoned that the fact that the police are also investigating other crimes is irrelevant if, in obtaining the accused's statements, the state violates the Sixth Amendment by knowingly circumventing the accused's right to counsel. *Id.* at 178-180.

In his dissent, Chief Justice Burger contended that no Sixth Amendment violation had occurred because the police had obtained the statements while conducting a good-faith investigation of entirely separate crimes. *Id.* at 181, 184. The Chief Justice noted that the Court's previous decision in *Massiah* had extended Sixth Amendment protections to their outermost point, and stated that "I would not expand them more and well beyond the limits of precedent and logic." *Id.* at 190.

In this case, defendant's Sixth Amendment right to counsel attached at least at the time of her April 1991 preliminary examination. *McNeil, supra.* There is no question but that defendant invoked her right to counsel. And, I assume that on February, 23, 1993, Crock, in his undercover capacity, deliberately elicited incriminating statements from defendant concerning her husband's murder. See, e.g., *Kuhlmann v Wilson,* 477 US 436; 106 S Ct 2616; 91 L Ed 2d 364 (1986); *Henry, supra; Massiah, supra.* However, this case obviously is factually distinguishable from *Moulton, Henry,* and *Massiah* inasmuch as here no charges were pending against defendant when Crock obtained defendant's statements concerning the murder because the charges that had been brought

against her had been dismissed and she had been discharged by the district court.[6]

However, defendant again relies on *Gonyea* for her argument that her Sixth Amendment right to counsel continued after the dismissal of the charges but during the pendency of the prosecutor's appeal in the appellate courts of this state. In *Gonyea*, the defendant gave the police several incriminating statements during an interrogation that followed his sentencing for a conviction of second-degree murder. 421 Mich 467. Following the reversal of his conviction on appeal, these statements were admitted at the defendant's retrial for the purpose of impeaching the defendant's testimony at his retrial. *Id.* at 468.

---

[6] I note that although *Moulton* discusses the Sixth Amendment in terms of "pending charges," the effect of the Supreme Court's disposition in that case was to remand for a new trial with respect not only to charges that were pending when the state illegally obtained the defendant's incriminating statements (the theft charges in connection with the Ford truck, the Chevrolet truck, and the Ford automotive parts) but also with respect to charges that were not pending when the state illegally obtained the defendant's incriminating statements (the burglary charges in connection with the same property). See *Moulton, supra* at 167. Thus, several courts have indicated that the Supreme Court's disposition in *Moulton* created an exception to the offense-specific requirement of *McNeil*, i.e., that the Sixth Amendment prohibits the use of incriminating statements obtained not only with respect to pending charges but also with respect to uncharged offenses that are "extremely closely related to" or "inextricably intertwined with" pending charges. See, e.g., *United States v Laury*, 49 F3d 145, 150 (CA 5, 1995); *United States v Carpenter*, 963 F2d 736, 740-741 (CA 5, 1992); *United States v Hines*, 963 F2d 255, 257-258 (CA 9, 1992); *United States v Cooper*, 949 F2d 737, 743-744 (CA 5, 1991); *United States v Rodriguez*, 931 F Supp 907, 926-928 (D Mass, 1996); *United States v Richardson*, 837 F Supp 570, 573-574 (SD NY, 1993); *Illinois v Clankie*, 124 Ill 2d 456, 462-464; 530 NE2d 448 (1988); *Whittlesey v State*, 340 Md 30; 665 A2d 223 (1995). However, I find that this aspect of *Moulton* and the resulting "inextricably intertwined" exception distinguishable from this case where *no* charges were pending against defendant at the time her statements were obtained by Crock.

A majority of our Supreme Court held that the incriminating statements were inadmissible for any purpose. *Id.* at 465 (Williams, C.J., with whom Kavanagh and Levin, JJ., concurred), 483 (Cavanagh, J., concurring in the result). Justice Cavanagh apparently premised his holding on the ground that the statements had been obtained in violation of the defendant's Sixth Amendment right to counsel. *Id.* at 482. Although applying by analogy cases involving the Sixth Amendment, Chief Justice Williams premised his holding solely on the ground that the statements had been obtained in violation of the defendant's Const 1963, art 1, § 20 right to counsel. *Gonyea, supra* at 469. In concluding that the defendant's right to counsel under the Michigan Constitution applied to the defendant's postconviction statements, the Chief Justice, relying on a case involving facts similar to the facts before the Court, reasoned as follows, *id.* at 470:

> In the instant case, there is no question that the inculpatory statements were deliberately elicited from the defendant after judicial proceedings had been initiated against him. The only question might be whether the judicial proceedings had ended, because the inculpatory statements were not elicited until after sentencing. In this regard we agree with the Court of Appeals that the "right to counsel is applicable to post-trial statements when appeal is not final. See *Cahill v Rushen,* 501 F Supp 1219 (ED Cal, 1980) [*aff'd* 678 F2d 791 (CA 9, 1982)]." *People v Gonyea,* 126 Mich App 177, 183; 337 NW2d 325 (1983). If the right to counsel is to remain appropriately meaningful, the right must extend until the appeal is final. An attorney's advisory role does not end at sentencing. See *Cahill v Rushen,* 678 F2d 794-795; *Cahill v Rushen,* 501 F Supp 1223. This is especially true in light of the fact that the appellate process is not the end of a defendant's prosecution, and may very well be just a new beginning, in that frequently trial errors result in the order-

ing of new trials on appeal. See *Cahill v Rushen*, 678 F2d
794-795; *Cahill v Rushen*, 501 F Supp 1223. Thus we hold
that the defendant here did have the right to counsel after
sentencing when he was with the detectives.

Unlike this case, the charges against the defendants
in *Gonyea* and *Cahill* were never dismissed. Thus, the
facts of *Gonyea* and *Cahill* could be viewed as falling
squarely within the general rule that the Sixth Amend-
ment "bars the use at a subsequent trial of incriminat-
ing statements which the government has deliberately
elicited from the defendant after indictment and in
the absence of counsel." See *Cahill v Rushen*, 678
F2d 793 (citing, in part, *Henry, supra*, and *Massiah,
supra*); but see the opinion of Wallace, J., *id.* at 796,
dissenting on the ground that the Sixth Amendment
has no application to events taking place outside the
courtroom after sentencing.[7] Accordingly, while
instructive in certain respects, we find *Gonyea* and
*Cahill* distinguishable and, therefore, not dispositive
in this case.

In *Claudio v Scully*, 982 F2d 798, 799-800 (CA 2,
1992), the Second Circuit Court of Appeals held that
the Sixth Amendment right to counsel attached dur-
ing the pendency of a pretrial appeal. Before formal
proceedings were initiated in that case, the defendant
confessed to murder as a result of his first counsel's
inadequate advice. The defendant was then indicted
in the state trial court and a second attorney was
appointed to represent him. *Id.* at 800. The trial court
granted the defendant's motion to suppress his con-
fession on the ground that his Sixth Amendment right

---

[7] See also the quotation of the dissenting opinion in *Claudio v Scully*,
982 F2d 798 (CA 2, 1992), discussed later in the text of this opinion.

to effective assistance of counsel had been violated
by the conduct of his first attorney. *Id.* The prosecu-
tion appealed, and the state intermediate appeals
court reversed, concluding that the defendant's Sixth
Amendment right to counsel had not attached at the
time the defendant gave his confession because no
adversarial proceedings had been commenced against
the defendant. *Id.* The state intermediate appeals
court also concluded, sua sponte, that the defendant's
right to counsel under the state constitution had not
been violated because, although that right had
attached before the defendant confessed, the state
right to counsel before the initiation of formal pro-
ceedings did not include a state right to effective
assistance of counsel. *Id.* The defendant appealed to
the state supreme court, which affirmed the decision
of the state intermediate appeals court with respect
to the Sixth Amendment issue. *Id.* at 801. The defend-
ant's second counsel did not raise any issue concern-
ing the state constitutional right to counsel. *Id.* The
defendant was then tried and convicted.

The defendant subsequently petitioned for habeas
corpus relief in the federal district court, contending,
in part, that his Sixth Amendment right to counsel
had been violated when his second counsel had failed
to raise the state constitutional ineffective assistance
of counsel claim concerning his first attorney's con-
duct during his pretrial appeal to the state supreme
court. *Id.* The district court denied the requested
relief. *Id.*

The United States Court of Appeals for the Second
Circuit reversed the decision of the district court with
respect to the Sixth Amendment issue. *Id.* As relevant
to this case, the Second Circuit Court of Appeals

found that the defendant's Sixth Amendment right to counsel had attached at the time of the pretrial appeal because "[c]learly, formal proceedings had [been] commenced against" the defendant. *Id.* at 802. The court also concluded that the defendant's pretrial appeal to the state supreme court "was unquestionably a critical stage" of the proceedings. *Id.* In so concluding, the court noted that the prosecution had certified that the defendant's confession was essential to their case, without which they could not proceed against the defendant. *Id.* The court also stated as follows:

> The Supreme Court in *Ross v Moffitt*, 417 US 600; 94 S Ct 2437; 41 L Ed 2d 341 (1974), provides additional support for our determination that [the defendant's] right to counsel had attached at the time of his pre-trial appeal. The *Ross* Court compared the trial stage to the post-conviction appellate process, and decided not to extend the right to counsel to post-conviction discretionary appeals. The Court wrote that:
>
>> it is ordinarily the defendant, rather than the State, who initiates the appellate process, seeking not to fend off the efforts of the State's prosecutor but rather to overturn a finding of guilt made by a judge or jury below. The defendant needs an attorney on appeal not as a shield to protect him against being 'haled into court' by the State and stripped of his presumption of innocence, but rather as a sword to upset the prior determination of guilt.
>
> *Id.* at 610-11, 94 S Ct at 2443-44. Here, [the defendant] needed [his second counsel's] assistance as a shield, not a sword. The prosecution initiated the appellate process at a time when [the defendant's] presumption of innocence remained intact. [*Claudio, supra* at 802-803].

In *Claudio*, it is not at all clear from the opinion whether, as in this case, the charges were dismissed against the defendant and he was discharged by the court. Rather, I note that the dissenting opinion in *Claudio* denominates the prosecutor's appeal as an interlocutory appeal from the trial court's suppression order. *Id.* at 806 (Newman, J., dissenting). Moreover, I also note the following discussion in the dissenting opinion concerning whether the Sixth Amendment attaches to a pretrial appeal, *id.* at 807:

> I have no doubt that [the pretrial] appeal was an important stage, the outcome of which could be critical for [the defendant]. But whether it was a "critical stage" for Sixth Amendment purposes is uncertain.
>
> The Supreme Court has ruled that whatever right to counsel exists at the post-conviction appellate stage of a state criminal case is secured directly by the Due Process Clause of the Fourteenth Amendment, rather than through incorporation of the Sixth Amendment, which protects the "trial-level right to counsel." . . . The Court has also ruled that there is no Due Process right to counsel in discretionary post-conviction appeals. . . . [The defendant's] appeal to the [state's highest appellate court] was discretionary, but it was a pre-conviction appeal. The majority relies on *Ross* [*supra* at 610-611], where the Court noted the significant difference between having counsel prior to conviction "as a shield" and having counsel after conviction "as a sword." *Id.* I am not certain whether the Supreme Court would afford Sixth Amendment protection to a discretionary pre-trial appeal to challenge the lawfulness of a confession when such protection would not be available directly under the Due Process Clause to challenge the same confession on a discretionary post-trial appeal. But I will assume, for the argument, that the Sixth Amendment attached to the pretrial discretionary appeal and consider the majority's subsequent steps.[2]

[2] In considering whether the appeal to the [state's highest appellate court] was a "critical stage" for purposes of a constitutional right to counsel, a third variable is arguably pertinent, in addition to whether the appeal is discretionary or of right, and whether it precedes or follows conviction. The third variable is whether the appeal is forced upon the defendant by the State or initiated by the defendant. The argument for considering the appeal to be a critical stage is stronger where the appeal is initiated by the State. In this case, the assessment of this third factor is complicated by the fact that the State initiated the appeal to the [state's intermediate appellate court], but the defendant thereafter initiated the further appeal to the [state's highest appellate court].

Thus, although instructive, we find *Claudio* distinguishable from the facts of this case and, therefore, not dispositive.

"The Sixth Amendment right is a post charge right." *United States v Olsen*, 840 F Supp 842, 851 (D Utah, 1993). The Sixth Amendment right to counsel continues until the individual is no longer the accused, i.e., until the individual is either convicted or freed by reason of acquittal *or dismissal of the charges. United States ex rel Espinoza v Fairman*, 813 F2d 117, 125 (CA 7, 1987), overruled on another ground *United States v LaGrone*, 43 F3d 332, 337, n 6 (CA 7, 1994).[8] These statements are in accord with the Supreme Court's discussion of the Sixth Amendment right to counsel. For instance, in *Jackson, supra*, 475 US 632, the Court stated that "after a formal accusation has been made—and a person who had previously been

[8] See also *People v Crusoe*, 433 Mich 666; 449 NW2d 641 (1989) (declining to follow the portion of the opinion in *Espinoza* that was subsequently overruled in *LaGrone*).

just a 'suspect' has become an 'accused' within the
meaning of the Sixth Amendment—the constitutional
right to the assistance of counsel is of such impor-
tance that the police may no longer employ tech-
niques for eliciting information from an uncounseled
defendant that might have been entirely appropriate
at an earlier stage of their investigation." In *Moulton*,
*supra*, 474 US 176, the Court stated that "[t]he Sixth
Amendment guarantees the accused, at least after the
initiation of formal charges, the right to rely on coun-
sel as a 'medium' between him and the State." Thus,
because I view as significant the facts here that the
case against defendant was dismissed and she was
discharged by the district court, I turn to a considera-
tion of cases considering a defendant's Sixth Amend-
ment right to counsel where the charges against the
defendant have been dismissed.

Several courts have found that the Sixth Amend-
ment right to counsel continues beyond the dismissal
of formal charges. In *United States v Marshank*, 777
F Supp 1507, 1518 (ND Cal, 1991), the federal prose-
cutor dismissed a 1987 indictment charging drug-
related offenses against the defendant because the
defendant had failed to cooperate as expected and
the evidence against the defendant was otherwise
insufficient to convict at trial. However, the prosecu-
tor intended to again indict the defendant after fur-
ther investigation. *Id.* Both before and after the dis-
missal of the first indictment, the defendant's attorney
was providing information concerning the defendant
to the federal government during its ongoing investi-
gation of the defendant. *Id.* at 1512-1518. Following a
second indictment in 1990 for drug-related charges,
the defendant moved to dismiss the indictment on the

ground that prosecutorial misconduct had created a
conflict of interest between himself and his attorney,
thereby denying him his Sixth Amendment right to
counsel. *Id.* at 1511, 1518, 1524. The government con-
tended that even if it violated the defendant's Sixth
Amendment rights with respect to the first indict-
ment, the second indictment remained untainted, cit-
ing the rule that the Sixth Amendment attaches only
after judicial proceedings have been initiated against
a defendant and arguing that in this case the second
indictment involved different charges. *Id.* The district
court rejected this argument:

> [T]he government errs in concluding that the defendant's
> first and second indictments necessarily represent two dis-
> tinct prosecutions for the purposes of Sixth Amendment
> analysis.
>
> In *United States v Valencia,* 541 F2d 618, 622 ([CA 6,]
> 1976), the Sixth Circuit rejected an argument, similar to the
> one offered by the government here, that the defendant's
> Sixth Amendment rights had not been violated because the
> government interference [with the attorney-client relation-
> ship] was related to charges which had been dismissed and
> was unrelated to the subsequent indictment challenged by
> the defendant. However, the court ruled that dismissal of an
> indictment against a defendant does not bring an end to the
> prosecution of the defendant if the defendant is later rein-
> dicted on charges which "grow out of the same dealings
> that were the subject of the [prior] charges." [*Id.*]
>
> The *Valencia* holding reflects the core principles of Sixth
> Amendment doctrine. The Sixth Amendment attaches after
> the initiation of judicial proceedings because it is at this
> point that
>
>> the government has committed itself to prosecute,
>> and . . . the adverse positions of government and
>> defendant had solidified. It is then that a defendant
>> finds himself faced with the prosecutorial forces of

organized society, and immersed in the intricacies of
substantive and procedural law.

*Kirby* [*supra*, 406 US 689]. Having engaged in prosecutorial
misconduct the government may not evade the Sixth
Amendment simply by dismissing the initial indictment and
reindicting the defendant on charges stemming from the
same investigation. To hold otherwise would allow the gov-
ernment to use its prosecutorial powers to eviscerate
defendants' right to counsel. [*Marshank, supra* at 1525-
1526.]

Noting (1) that the prosecution had dismissed the
first indictment in order to obtain additional evidence
against the defendant, (2) that the defendant's attor-
ney had continued to participate in the government's
investigation of the defendant following the dismissal
of the first indictment, and (3) that the charges
involved in both indictments concerned similar activ-
ity, the district court found that "the two indictments
are, for purposes of Sixth Amendment analysis, part
of the same prosecution of [the defendant]." *Id.* at
1526-1527. The court concluded that the second
indictment was tainted by the government's violation
of the defendant's Sixth Amendment right to counsel,
and dismissed the indictment. *Id.* at 1526, 1528.

In *State v Frye*, 897 SW2d 324, 325 (Tex Crim App,
1995), the defendant retained counsel after being
charged by complaint in state court with a misde-
meanor theft-related offense. The prosecutor subse-
quently moved to dismiss the complaint, specifically
noting that the charge was being dismissed "pursuant
to a 'continuing investigation including this transac-
tion.' " *Id.* Thereafter, a prosecutor and a prosecutor's
intern each telephoned the defendant and recorded
the ensuing conversations without the knowledge of

the defendant, who stated that he was still repre-
sented by counsel. *Id.* at 325-326. The defendant was
subsequently indicted on felony theft-related charges
that included the conduct charged in the first com-
plaint. *Id.* at 326. The trial court granted the defend-
ant's motion to dismiss the indictment on the ground
of prosecutorial misconduct. *Id.* The state appealed,
and the Texas Court of Appeals affirmed the trial
court's dismissal on the ground that the conversations
violated the defendant's Sixth Amendment right to
counsel. *Id.* at 325, 327. The state appealed again,
arguing that the conversations had not violated the
defendant's Sixth Amendment right to counsel where
the defendant had not been charged with a crime
when the conversations occurred. *Id.* at 327.

The Texas Court of Criminal Appeals disagreed. *Id.*
at 330. The court found that the defendant's Sixth
Amendment right to counsel had attached when the
state filed the misdemeanor complaint because the
state had, at that time, committed itself to prosecute,
the positions of the state and the defendant were
adversarial, and the defendant had invoked his right
to counsel. *Id.* at 328. However, the court noted that
after the misdemeanor charge had been dismissed,
"there was nothing upon which [the defendant] could
be convicted, nor were there charges under which the
State could conduct a prosecution. . . . Thus, the posi-
tions of the State and [the defendant] absolutely
changed and they were no longer in legally adver-
sarial positions. This is an important consideration."
*Id.* The court also noted that a strict reading of cases
interpreting the Sixth Amendment indicated that the
state had not violated the defendant's Sixth Amend-
ment right to counsel by initiating telephone conver-

sations with the defendant after the misdemeanor charge had been dismissed. *Id.* As a countervailing consideration, the court noted the potential for governmental abuse if the prosecution could "dismiss all charges against the accused, [and] put the 'adversarial' proceedings on hold to re-initiate questioning without the presence of counsel, thus giving the State the power to unilaterally sever [the defendant's] constitutional rights and protections." *Id.* at 329. The Court held as follows:

> We therefore find that even though the dismissal of the misdemeanor information and complaint altered the positions of the parties, such dismissal was accomplished specifically for the purpose of conducting a "continuing investigation including this transaction." Additionally, the charges set forth in the misdemeanor complaint were again alleged in the felony indictment and aggregated with other theft of services offenses in order to increase the offense grade to a felony. Thus, . . . the offenses charged in the felony indictment were not "new or additional crimes" being investigated, but rather they were substantially related, and in some cases exactly the same as the charges of theft of services originally alleged in the misdemeanor information and complaint. Under the unique facts of this case, we hold that [the defendant's] Sixth Amendment right to counsel remained when the telephone conversations at issue occurred. We also find the conversations constituted a critical stage for Sixth Amendment purposes. . . . [The defendant] was therefore entitled to assistance of counsel during the interrogations, and his Sixth Amendment rights were violated by the State initiated questioning without the knowledge or presence of counsel. The State's first ground for review is overruled. [*Id.* at 329-330.]

Conversely, some courts have found that incriminating statements obtained after charges have been dismissed do not violate a defendant's Sixth Amend-

ment right to counsel. In *United States v Skipworth*, 697 F2d 281, 283 (CA 10, 1983), a tape recording of a conversation between the defendant and a paid informant for the federal government was presented to the jury at the defendant's federal trial on federal charges. The informant also testified that government agents had told her that the defendant had been indicted in state court. *Id.* Following his conviction, the defendant appealed, arguing that the tape recording should have been suppressed because its use violated his Sixth Amendment right to counsel. *Id.* The Tenth Circuit Court of Appeals rejected the defendant's argument:

> The record contains no evidence of what the state charges were or what happened to them. Defendant says in his brief that the state charges were similar to those for which he was tried and convicted in federal court; that in March 1979, he demurred to the state charges; that his demurrer was sustained; and that the state district attorney "made clear his intentions to appeal said ruling." . . . None of those statements are supported by the record before us. The government in its brief says . . . that the state charges were dismissed on January 15, 1979. This statement is unchallenged. The defendant filed no reply brief. The tape recording was made on February 20, 1980. Nothing in the record shows that any criminal charges were then pending anywhere against the defendant.
>
> Nothing in *Kirby* [*supra*] or *Massiah* [*supra*] supports defendant's theory that when right [sic] to counsel attaches in a state prosecution it carries over to a subsequent federal investigation made after the dismissal of the state charges. A person may not immunize himself from federal investigation by reliance on a state criminal charge previously dismissed on his motion. [*Id.* 283-284.][9]

---

[9] See also *United States v Garcia*, 861 F Supp 996, 1006 (D Kan, 1994), in which the district court in a federal prosecution concluded that no

In *United States v Martinez*, 972 F2d 1100, 1101 (CA 9, 1992), the defendant was arrested in March 1990 and was charged in state court with possession of a firearm by a convicted felon, theft of a firearm, and possession of a controlled substance. At his state court arraignment, the defendant requested counsel. *Id.* However, the state charges were dismissed, and, therefore, no counsel was appointed for the defendant. *Id.* at 1102. He remained in state custody because his parole had been revoked upon his arrest. *Id.*

On September 4, 1990, and two days before the defendant's custodial time for the parole violation was scheduled to elapse, a federal criminal complaint was filed alleging a charge (possession of a firearm by the defendant, a convicted felon) similar to the previously dismissed state firearm possession charge. *Id.* On September 6, state authorities released the defendant into federal custody. *Id.* Pursuant to interrogation by federal agents, the defendant made incriminating statements concerning the gun that was the subject of the charges. *Id.* The defendant then made his first appearance in federal court, and coun-

---

Sixth Amendment right to counsel attached to the questioning of the defendant by federal agents, in part, because federal charges against the defendant had been previously dropped by the government; cf. *United States v Louis*, 679 F Supp 705, 709 (WD Mich, 1988), in which the district court in a federal prosecution suppressed the use of the defendant's statements to federal agents on Sixth Amendment grounds although no federal charges had been pending against the defendant at the time he was questioned by the federal agents because the defendant had already been formally charged in state court for the same conduct on which the subsequent federal charges were based, the federal agents questioned the defendant at the request of the state prosecutor, the state prosecutor and federal agents viewed a suit by the federal sovereign as interchangeable, and the federal agents understood that the state charges would be dropped if federal charges were brought against the defendant. Although defendant relies on *Louis*, which distinguished *Skipworth*, *Louis* itself is clearly distinguishable from the facts of this case.

sel was appointed. *Id.* After indictment, the defendant moved to suppress his statement to the federal agents on the ground that their interrogation after his earlier request for counsel on the state charges violated his Sixth Amendment right to counsel. *Id.* The district court granted the defendant's motion, and the United States appealed. *Id.*

On appeal, the federal government argued that the defendant did not have a Sixth Amendment right to counsel at the time he was questioned by the federal agents because there were no charges pending against him at that time. *Id.* at 1104. The defendant argued that the Sixth Amendment doctrine of "inextricable intertwinement"[10] should be extended indefinitely in time and that, therefore, once a defendant has been charged, he may not thereafter be interrogated about the subject matter of those charges unless his counsel is present. *Id.* at 1103-1104. The Court of Appeals for the Ninth Circuit rejected the defendant's argument:

> We are reluctant, however, to extend that doctrine indefinitely into the future after the initial charge is dismissed. To do so would extend the prohibition on interrogation outside the presence of counsel to any investigation of a given set of acts, even if the second investigating unit had no connection to the first. It would require suppression of a statement given to federal authorities regarding a federal crime if, unbeknownst to the federal agents, the suspect had been charged for the same substantive acts at some earlier time. Such a broad prophylactic application of the Sixth Amendment runs counter to the reasoning of *Moulton* [*supra*] and *McNeil* [*supra*], which stressed both the narrow application of the Sixth Amendment right to counsel and the impor-

---

[10] See note 6, *ante.*

tance of allowing police to initiate and pursue investigations. [*Id.* at 1104-1105.]

The defendant also argued that his questioning by the federal agents violated his Sixth Amendment right to counsel because the state and federal authorities had cooperated so closely that he was, in effect, subject to prosecution for a single offense by different sovereigns. *Id.* at 1105. The defendant argued that such conduct did not comport with the policies underlying the Sixth Amendment. *Id.* In response, the Court of Appeals for the Ninth Circuit stated as follows:

> If [the defendant] is correct in asserting that the federal and state authorities worked together in shuffling his charge from the state to the federal system, then the situation is analogous to that in *Jackson* [*supra*][11] and [the defendant's] statements should be suppressed. Where there is improper collusion, there is no danger that the second sovereign will unwittingly violate the Sixth Amendment by interrogating a suspect in ignorance that he or she was charged by another sovereign at some time in the past.
>
> There are, moreover, sound reasons for permitting suppression in cases of collusion . . . . If the dismissal of state charges or the initiation of federal interrogation was a mutual endeavor in anticipation of a federal prosecution, then, as a practical matter, [the defendant's] Sixth Amendment right not to be interviewed without his counsel was circumvented. He was prosecuted on a charge identical to that of the state, using a statement that the state could not have secured from him if it had proceeded with its prosecution. The key, of course, is the extent of coordination

---

[11] *Jackson, supra* at 636, held that any waiver of a defendant's right to counsel is invalid if it is obtained in a police-initiated interrogation following the defendant's assertion of the right at his arraignment or similar proceeding. See also *Martinez, supra* at 1103.

between the state and federal authorities. [*Martinez, supra* at 1105.]

Because no record had been developed concerning the issue of the state and federal coordination, the appellate court vacated the district court's suppression order and remanded the matter for factfinding concerning this issue. *Id.* at 1105-1106. Although declining to rule with respect to the precise acts of cooperative conduct that would amount to collusion to circumvent the defendant's Sixth Amendment rights, the court stated:

> Areas appropriate for factual inquiry include the degree of federal participation, if any, in the state's decision to dismiss its charges; the degree of state participation, if any, in the decision of federal officers to interrogate and charge [the defendant]; and the degree of joint decisionmaking over the forum in which [the defendant] should be prosecuted. This list is not exhaustive; other areas of inquiry may well suggest themselves to the experienced district judge. [*Id.* at 1106.]

On remand and after an evidentiary hearing, the district court found that the state prosecutor knew in March 1990 that the United States Attorney was interested in a federal prosecution of the defendant, but that there was no guarantee of a federal prosecution. *United States v Martinez*, 816 F Supp 644, 645-646 (D Or, 1993). The court found that the state attorney's awareness of the federal interest did not establish collusion where the state attorney testified that he would have dismissed the state charges against the defendant in any event. *Id.* at 646. The court found that the federal agent made an impromptu decision to interrogate the defendant and that no evidence was presented that any federal agents knew that the

defendant had previously invoked his Sixth Amendment right to counsel. *Id.* The district court held that these facts did not establish that the state and federal officials colluded to circumvent the defendant's rights and denied the defendant's motion to suppress. *Id.* In so holding, the district court implicitly rejected the defendant's assertion that the court was required to suppress his statements if it found some degree of communication and coordination between the state and federal officials. See *id.* at 645.

I begin my analysis in this case by returning to what, as indicated previously, I perceive as the dispositive fact in this case—the dismissal of the case against defendant and her dismissal by the district court following the preliminary examination with respect to the initial state charges. The relevant court rule provides as follows:

> If, after considering the evidence, the court determines that probable cause does not exist to believe either that an offense has been committed or that the defendant committed it, the court must discharge the defendant without prejudice to the prosecutor initiating a *subsequent prosecution* for the same offense. [MCR 6.110(F) (emphasis supplied).]

Thus, in dismissing the case against defendant and discharging her, the district court determined that the prosecution had failed to demonstrate either that an offense had been committed or that defendant committed an offense. *People v Nevitt*, 76 Mich App 402, 403; 256 NW2d 612 (1977). However, the discharge did not operate as a bar to another, subsequent prosecution. *People v Hayden*, 205 Mich App 412, 414; 522 NW2d 336 (1994) (stating that "[d]ismissal of a defendant at a preliminary examination is without

prejudice to renewal of the charges"). Accordingly, as explained in *Frye, supra*, 897 SW2d 328, when the case against a defendant is dismissed and the defendant is discharged, the positions of the state and the defendant are absolutely changed—there is nothing upon which the defendant could be convicted, nor are there charges under which the state could conduct a prosecution. The fact that the prosecution appealed the district court's refusal to bind over defendant for trial does not change this conclusion. Thus, for the purpose of the Sixth Amendment, although the state had committed itself to prosecuting defendant, it would appear that the government's adverse position was not solidified where the district court, in discharging defendant on the basis of insufficient evidence, necessarily determined that probable cause did not exist to believe either that the charged offenses had been committed or that defendant had committed them. See *Gouveia, supra*, 467 US 189. Moreover, following the dismissal of the charges and the discharge of the defendant on the basis of the district court's determination that the evidence was insufficient for a formal accusation to lie against defendant, it would appear that the defendant was no longer an accused for Sixth Amendment purposes but rather again was only a suspect. See *Jackson, supra*.

In *Marshank* and *Frye*, the courts concluded that a defendant's Sixth Amendment right to counsel continued during the period following the dismissal of the charges against a defendant. However, the considerations that caused the courts in those cases to reach that conclusion are not present in this case. In both of those cases, the prosecution itself dismissed the initial charges with the intent to further investigate

the defendant. The courts were concerned that the government could abuse the charging process by dismissing charges against a defendant for the purpose of further investigation and thereby circumvent the defendant's right to counsel That concern is not implicated in this case where the determination to dismiss the charges against the defendant was an independent factual and legal determination by the district court over the prosecutor's objection.

In *Skipworth*, implicitly, and *Martinez*, explicitly, the courts rejected arguments that the Sixth Amendment extends indefinitely into the future once initial charges have been dismissed. Although these cases were decided in the context of a subsequent federal prosecution following the dismissal of state charges, whereas this case involves a subsequent state prosecution of state charges that had been previously dismissed, we find the reasoning of these cases persuasive in this case. In particular, we note that in *Martinez* it is clear that the conduct that was the subject of the dismissed state charge was the same conduct that the defendant was thereafter questioned about by the federal agents. I reiterate the *Martinez* court's discussion of its reluctance to extend the Sixth Amendment indefinitely into the future once charges have been dismissed:

> We are reluctant, however, to extend that doctrine indefinitely into the future after the initial charge is dismissed. To do so would extend the prohibition on interrogation outside the presence of counsel to any investigation of a given set of acts, *even if the second investigating unit had no connection to the first*. It would require suppression of a statement given to federal authorities regarding a federal crime if, unbeknownst to the federal agents, the suspect had been charged for the same substantive acts at some earlier time.

Such a broad prophylactic application of the Sixth Amendment runs counter to the reasoning of *Moulton* [*supra*] and *McNeil* [*supra*], which stressed both the narrow application of the Sixth Amendment right to counsel and the importance of allowing police to initiate and pursue investigations. [*Martinez, supra,* 972 F2d 1104-1105 (emphasis supplied).]

In this case, the record reveals that Crock knew at the time he questioned defendant on February 23, 1993, that the state charges against her had been dismissed, that her case was on appeal, and that she was represented by counsel. Crock questioned defendant for the dual purpose of eliciting information concerning his federal drug investigation and the murder of defendant's husband. See *Moulton, supra,* 474 US 179, n 15 ("dual purposes may exist whenever police have more than one reason to investigate someone"). The evidence he derived from this questioning was used in the state trial of defendant.

However, in finding that Crock's federal investigation was "a separate and distinct ongoing federal narcotics investigation which the DEA was genuinely and legitimately pursuing, totally independent of the state homicide case," the Recorder's Court essentially found that "the second investigating unit [Crock] had no connection to the first [the state homicide investigation]" and that there was no collusion between Crock and the state homicide investigation. *Martinez, supra.* After reviewing the record utilized by the Recorder's Court in making this finding,[12] I am not left

---

[12] Proper evaluation of a defendant's suppression claim requires review of the information known to the Recorder's Court at the time it denied the defendant's motion to suppress. *Burrell, supra.* During discussions with counsel in this case, the Recorder's Court indicated that in deciding defendant's Sixth Amendment claim it had relied on the pleadings of

with a definite and firm conviction that the Recorder's Court was mistaken. *Burrell, supra.* Although there was some communication between Crock and Rice, there is no indication in the record that they were coordinating their efforts to question defendant concerning the murder of her husband, nor is there any indication that Rice had any control or direction over either the federal investigation in general or Crock's questioning of defendant concerning the murder specifically. Rather, the record indicates that Crock acted solely on his own in questioning defendant for the dual purpose of eliciting information concerning the Texas transaction and the murder. More than a bare suspicion is required to show a mutual state/federal cooperative or working arrangement. *Olsen, supra,* 840 F Supp 849.[13] Thus, where Crock was conducting an investigation independent of the state investigation, I believe the argument for

counsel, the hearing it had conducted concerning defendant's Fifth Amendment claim, and the preliminary examination transcript.

[13] Although I base my conclusion solely on the record relied upon by the Recorder's Court in making its suppression ruling, see note 12, *supra,* I cannot help but note that at trial both Crock and Rice testified that Crock contacted Rice in April 1992, (after defendant surfaced in the federal investigation) only for background information. Crock and Rice both testified that Crock contacted Rice before the February 23, 1993, meeting with defendant only to inform Rice that a meeting with defendant was scheduled. Crock testified that he had no knowledge of the details of the homicide except for what he read in the newspaper. Crock testified that he had no knowledge or recall that either he or others in the federal narcotics investigation received any information concerning the defendant and the state's homicide investigation from Rice or others in the Detroit Police Department. Rice too testified that he never gave Crock any "particulars" concerning the homicide case. Crock testified that he viewed his contacts with Rice as administrative contacts, not investigative contacts. Crock and Rice both testified that after Crock's February 23, 1993, meeting with defendant Crock contacted and informed Rice of what happened at the meeting. Rice testified that he did not view the February 23, 1993, tape until more than three months after it was made because it was part of an ongoing federal drug investigation to which he was not privy.

refusing to extend the Sixth Amendment indefinitely into the future once the original charges have been dismissed is strengthened.

Finally, in deciding the Sixth Amendment question, I do not find controlling the fact that defendant continued to be represented by her retained counsel when she was questioned by Crock during the time that the charges against her had been dismissed. As explained in *Moran, supra,* 475 US 430, quoting *Moulton, supra* at 170, quoting *Kirby, supra* at 689:

> [T]he suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any "criminal prosecutio[n]," US Const, Am VI, the accused shall not be left to his own devices in facing the " 'prosecutorial forces of organized society.' "

In summary, the point at which the Sixth Amendment attaches " 'is far from a mere formalism.' " *Gouveia, supra,* 467 US 189, quoting *Kirby, supra* at 689. "[I]ncriminating statements pertaining to *pending charges* are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." *Moulton, supra* at 180 (emphasis supplied). In this case, no charges were pending against defendant when she was questioned by Crock. Moreover, unlike *Moulton, Henry,* and

*Massiah,* in which the surreptitious interrogations were conducted by the charging sovereign, in this case the defendant's statements were obtained by a different sovereign during a completely separate and legitimate investigation. Thus, where the unique facts of this case fall outside the facts of the *Moulton* line of cases, I conclude that balancing the narrow application of the Sixth Amendment right to counsel and the importance of allowing the authorities to initiate and pursue investigations compels the conclusion that once the case against defendant had been dismissed and she was discharged by the district court her Sixth Amendment right to counsel did not extend indefinitely to Crock's questioning of defendant during his separate investigation. Accordingly, although I do so on slightly different grounds, I would affirm the trial court's ruling that the evidence of defendant's statements did not warrant suppression.

Next, defendant argues that the trial court erred in permitting Anthony Riggs' mother to read the last letter he had written to her before returning home from the Gulf War. In the letter, Anthony Riggs informs his mother of problems he was having with defendant and states that divorce is wrong, that he wants the marriage to last, but that he will not support defendant if she is doing wrong by the marriage while he is serving his country. The trial court admitted the letter as circumstantial evidence of marital discord under MRE 803(3) (then existing mental, emotional, or physical condition).

Defendant argues that this evidence was inadmissible because Anthony Riggs' state of mind was not relevant in this case. I disagree. This evidence was admissible as statements "of the declarant's then

existing . . . intent, plan . . . [or] mental feeling." MRE 803(3); *People v Fisher*, 449 Mich 441, 450; 537 NW2d 577 (1995); see also *People v King*, 215 Mich App 301, 309; 544 NW2d 765 (1996) (the defendant's position that the decedent's state of mind must itself be at issue was not the approach taken by our Supreme Court in *Fisher, supra*). The evidence of the marital discord between Anthony Riggs and defendant was relevant to motive and more probative than prejudicial. *Fisher, supra* at 453.

The letter also details Anthony Riggs' love for his mother and sister and his pride in his military service. Defendant argues that this evidence was inadmissible because it simply evoked sympathy for Anthony Riggs and his mother and was, therefore, more prejudicial than probative. I agree. MRE 403. However, any error in the admission of this evidence was harmless where, in light of the resolution of defendant's first issue, the admissible evidence of defendant's guilt was overwhelming. *People v Mateo*, 453 Mich 203, 207; 551 NW2d 891 (1996).

Affirmed.

WHITE, P.J. *(concurring)*. Under the circumstances of this case, where the charges had been dismissed pursuant to a judicial determination that the state lacked probable cause to proceed against defendant, and where that determination was affirmed, so that the original prosecution was never reinstated, but, rather, defendant was recharged, I concur with Judge SMOLENSKI's conclusion that defendant's Sixth Amendment right to counsel was not violated.

I also concur with Judge SMOLENSKI's conclusion that any error in the admission of Anthony Riggs' letter to his mother was harmless.

R. R. LAMB, J. *(dissenting)*. I respectfully dissent. Recognizing that Tony Cato Riggs engaged in conduct that is reprehensible and criminal, her Sixth Amendment right to counsel continued with respect to the charge of murder brought by the State of Michigan, as long as defendant and the State of Michigan remained in an adversarial position pertaining to that charge.

A brief supplementation to the factual recitation in Judge SMOLENSKI's opinion is pertinent to address properly defendant's Sixth Amendment right to counsel claim.

Defendant was charged with first-degree murder in March 1991. She retained counsel, who secured her release from custody, and counsel appeared with defendant at arraignment on the warrant and at her preliminary examination. The charge against defendant was dismissed by the examining magistrate in April 1991. The prosecutor's office immediately appealed that decision to the Recorder's Court. The Recorder's Court affirmed the decision of the magistrate. The prosecutor's office then appealed to the Michigan Court of Appeals. On May 26, 1993, the Court of Appeals affirmed the decisions of the Recorder's Court and the magistrate. The prosecutor then applied for leave to appeal to the Michigan Supreme Court. All of the appeals brought by the prosecutor were timely filed, and defendant continued to be represented by counsel in all of the proceedings.

On November 30, 1993, the Supreme Court denied the prosecutor's application for leave to appeal. From March 1991 through November 30, 1993, defendant was represented continuously by the same attorneys in connection with the murder charge at all proceedings pending in the district court, the Recorder's Court, the Court of Appeals, and the Supreme Court.

Following the dismissal of the murder charge by the examining magistrate in April 1991 and during the prosecutor's appeals of that decision, defendant engaged in activities involving illegal drug transactions. Her conduct caused her to be investigated by the federal government. Defendant and others were being investigated by the federal government, and, in the course of that investigation, defendant had a number of meetings and conversations with federal agents who were acting in an undercover capacity as drug dealers. These meetings or conversations produced evidence used or sought to be used against defendant by the State of Michigan in the murder charges brought by the state. These meetings and conversations occurred in February, May, June, and July of 1993.

Defendant was arrested on federal drug charges on November 17, 1993, by federal agents. This arrest occurred in the City of Detroit. She was taken to the federal building in Detroit, and, after being booked and processed, she was shown a videotape of a February 23, 1993, conversation with Agent Richard J. Crock. During this conversation she detailed the events surrounding the murder of her husband and made several inculpatory statements. Immediately after defendant had been shown this video, Sergeant William Rice, who had been investigating this case

since the death of Mr. Riggs in March 1991, interviewed defendant at the federal building. Rice obtained an additional statement from defendant that defendant challenged by pretrial motion.

In November 1993, defendant was again charged by the State of Michigan with crimes arising out of the death of her husband, Anthony Riggs. The 1993 charges brought against defendant by the State of Michigan were first-degree murder, conspiracy to commit murder, solicitation to commit murder, and possession of a firearm during the commission of a felony. The charge of solicitation to commit murder involved one Antonio Shelby, who was a potential witness against defendant. Mr. Shelby's testimony had not been offered at the 1991 preliminary examination, and this fact was mentioned in the Court of Appeals opinion affirming the dismissal of the charge against defendant. *People v Riggs*, unpublished opinion per curiam, issued May 26, 1993 (Docket No. 142280).

At the 1993 preliminary examination of the four counts against defendant, the parties stipulated the prior testimony of five witnesses from the May 1991 exam, the identification of the deceased, and the admission of the autopsy report on Anthony Riggs. The only witness testifying live at the 1993 preliminary examination was Agent Crock.

At the conclusion of the 1993 preliminary examination, defendant was bound over to Recorder's Court on the charges of murder, conspiracy to commit murder, and solicitation to commit murder. The felony-firearm charge was dismissed by the magistrate.

Defendant moved to suppress the statements given by her to Agent Crock on February 23, 1993, and to Sergeant Rice following her arrest on November 17,

1993. The trial court found that defendant had a Sixth Amendment right to counsel that continued after dismissal of the charges following the 1991 preliminary examination and during the pendency of the prosecutor's appeals. The court found that defendant had not knowingly and understandingly waived her right to counsel during her conversation with Agent Crock. The court held, however, that the right to counsel had not been violated because the federal investigation was not an artifice, ruse, or subterfuge to obtain statements from defendant. The court found that the federal investigation was distinct from the murder investigation and that Agent Crock, in talking to defendant, had a dual investigative purpose.

The trial court suppressed the November 17, 1993, statement to Sergeant Rice. The court found that defendant had a continuing right to counsel and that she had been denied that right while she was held in custody. The court found further that at the time defendant gave her statement to Sergeant Rice, she had not waived her Sixth Amendment right to counsel.

Before trial, the court severed count three. The solicitation to commit murder charge was ultimately dismissed, following defendant's conviction in federal court on federal drug charges. In state court, defendant was tried and convicted of first-degree murder and conspiracy to commit murder of her husband, Anthony Riggs.

I agree with many of the authorities and the legal premises recited in Judge SMOLENSKI's opinion. I disagree with his application of the settled law to the facts established on the record in the trial court. Judge SMOLENSKI's opinion affirms the decision of the

trial court but for reasons different than those given by the trial court. I would not disturb the trial court's factual findings or the trial court's legal conclusion that defendant had a continuing right to counsel as guaranteed by the Sixth Amendment.

Because I do not agree with Judge SMOLENSKI's opinion to affirm defendant's conviction, I do not agree that the evidentiary issue concerning the introduction of the entire letter written by the deceased to his mother is harmless error.

I. THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL

The Sixth Amendment right to counsel is applicable to the states via the Fourteenth Amendment. This right does not attach until a prosecution is commenced by the initiation of adversary criminal proceedings. The right is offense specific and, once asserted, continues at critical stages of the proceedings against an accused. Government efforts to elicit information from an accused concerning a charged crime constitutes a critical stage of the proceedings.

For analysis of defendant's Sixth Amendment claim, the fact that the case against her was dismissed after her 1991 preliminary examination may be significant but it is not dispositive. This dismissal must be viewed in the larger context of the question, which is: Did the parties continue an adversarial position with one another following the dismissal of the charges by the examining magistrate? I believe the answer to this question is yes. Dismissal of a charge at a preliminary examination is without prejudice to the prosecutor refiling the charge. MCR 6.110(F). *People v Hayden,* 205 Mich App 412; 522 NW2d 336 (1994). Following dismissal of the charge, the adversarial relationship

between the state and defendant continued. The prosecutor initiated an appeal of the magistrate's decision and continued the appeal through every level of appellate review in the state court system. The prosecutor was seeking to continue or reinstate the charge against defendant. I read *United States v Gouveia*, 467 US 180; 104 S Ct 2292; 81 L Ed 2d 146 (1984), as support for the premise that the adverse positions of the government and defendant in this case had solidified. Defendant found herself faced with prosecutorial forces of organized society and immersed in the intricacies of substantive and procedural criminal law.

This adverse position between defendant and the government remained solidified during the appeal process. In *People v Gonyea*, 421 Mich 462; 365 NW2d 136 (1984), the Michigan Supreme Court stated that the right to counsel is applicable to posttrial statements when appeal is not final. The Court also stated: "If the right to counsel is to remain appropriately meaningful, the right must extend until the appeal is final." *Id.* at 470. There is no escaping the fact that the appeal was still pending when defendant was questioned by the federal agents in February 1993. Further, it is undisputed that during the pendency of the adversarial proceedings, defendant was represented by retained counsel.

The Court of Appeals opinion affirming the dismissal, *People v Riggs*, unpublished opinion per curiam, issued May 26, 1993 (Docket No. 142280), stated that there was legally insufficient evidence that defendant participated in this crime against her husband. My reading of this Court of Appeals opinion is that the magistrate refused to consider the statement of a codefendant, Michael Cato (defendant's brother), as

sufficiently credible evidence against defendant. The potential testimony of Antonio Shelby linking defendant to the murder was not offered as substantive evidence against defendant. The basis for the failure to establish probable cause appears to have been the failure to identify defendant as a participant rather than a failure to establish that, in fact, a criminal homicide had occurred. If the prosecutor had been successful in appealing the decision of the magistrate, defendant again would be facing formal charges. Consequently, although the formal charges had been dismissed by the magistrate, the positions of the parties remained adversarial during the pendency of the appellate proceedings.

I do not agree with the conclusion reached by Judge SMOLENSKI that the district court necessarily determined that probable cause did not exist to believe either that the charged offense had been committed or that defendant had committed it. It is difficult to reach a conclusion that the probable cause necessary to establish the corpus delicti was not established at the preliminary examination. An autopsy was conducted on the body of Anthony Riggs, which demonstrated that he died as a result of being shot. The corpus delicti of first-degree murder is shown by the death of the victim and some criminal agency as the cause. *People v Williams*, 422 Mich 381; 373 NW2d 567 (1985).

Although many of the cases discussed in Judge SMOLENSKI's opinion are factually different from the case now before this Court, the legal principles announced by those cases remain the same. It is clear that defendant was not in custody at the February 23, 1993, meeting. It is also clear that the method of ques-

tioning used by Agent Crock to further Sergeant Rice's investigation concerning the murder charge against defendant meets the definition of interrogation as defined by the United States Supreme Court. Finally, it is clear that at the time of the occurrence of this interrogation by an agent of the state concerning the specific offense that made the state the accuser of defendant, defendant had exercised her Sixth Amendment right to counsel.

In *Rhode Island v Innis*, 446 US 291; 100 S Ct 1682; 64 L Ed 2d 297 (1980), the United States Supreme Court defined the word interrogation. I recognize that *Innis* was defining the word in the context of the warnings required under *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). I recognize further that the *Miranda* warnings are required in a custodial setting and that defendant was not in custody. I believe, however, that the definition of interrogation is pertinent to an understanding of whether defendant was "interrogated" concerning the murder charge to which her Sixth Amendment right had attached and remained. The *Innis* Court stated:

> That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. [*Innis, supra* at 301.]

Judge Smolenski states: "I assume that on February 23, 1993, Crock, in his undercover capacity, deliberately elicited incriminating statements from defendant concerning her husband's murder." *Ante* at 680. There is no need to make an assumption concerning this issue. The record clearly establishes that Agent Crock did deliberately elicit incriminating statements from defendant on February 23, 1993.

Agent Crock very candidly testified that on February 23, 1993, he was aware of the murder charge against defendant. He knew that the charge had been dismissed and that defendant had been represented by counsel in connection with this charge. He also knew that there was an appeal involved, but he was unsure of the exact status of the appeal. Agent Crock had been in contact with Sergeant Rice on the day before or the day of February 23, 1993. This contact was before the meeting with defendant. The meeting had been preplanned and arranged to continue Crock's investigation of the drug charges and to put defendant in a position in which she would talk about her husband's murder. Agent Crock wanted to assist Sergeant Rice in his investigation. Crock had no independent interest in the murder investigation, but in the scope of his duties he would investigate any felony. Following the meeting with defendant, Agent Crock contacted Sergeant Rice.

I agree with that portion of Judge Smolenski's opinion in which it is stated that Agent Crock had a dual purpose for conducting his investigation. I agree also that there is no indication that Sergeant Rice had any control or direction over either the federal investigation in general or Crock's questioning of defendant concerning the murder specifically. I disagree with

and I believe the record clearly refutes the conclusion
that there is no indication that Rice and Crock were
coordinating their efforts to question defendant con-
cerning the murder of her husband and that Crock
acted solely on his own in questioning defendant for
the dual purpose of eliciting information concerning
the murder. Crock testified that the meeting was
arranged so that defendant would discuss the murder
case and that one of his purposes was to assist Ser-
geant Rice in furthering the murder investigation.
Thus, this case does not present an argument for
extending the Sixth Amendment indefinitely into the
future once original charges have been dismissed. I
continue to view the case as one involving a narrow
application of the Sixth Amendment right to counsel
to a specific charge that has been initiated in court
and has placed the state and the defendant in an
adversarial position. The fact that an examining mag-
istrate has dismissed a charge does not change the
fact that the parties remain in an adversarial position
when the state appeals the decision of the magistrate
and attempts to continue the charge against defend-
ant. Nor does the dismissal of the charge by the mag-
istrate change the fact that defendant continued to be
represented by counsel, after initiation of formal pro-
ceedings in court, or the fact that defendant did not
waive the right to counsel at the prearranged meeting.
It does not matter how many purposes Agent Crock
had for conducting the interrogation. One of his pur-
poses was to conduct an interrogation of defendant
concerning a pending charge in the absence of her
counsel. The Sixth Amendment will not protect
defendant from any statements pertaining to any fed-
eral charges where there was no Sixth Amendment

right to counsel because those charges had not been formally initiated. Merely because a defendant's statements may be used in one setting does not open the door to vitiating the Sixth Amendment right that had attached pertaining to other charges.

I agree with the statement that where federal questions are involved, the Court of Appeals is bound to follow the prevailing opinions of the United States Supreme Court. I agree also that where an issue has divided the circuits of the federal court of appeals, this Court is free to choose the most appropriate view. However, I feel that the United States Supreme Court, speaking through its majority opinions, has clearly ruled in this area of the Sixth Amendment right to counsel. In *McNeil v Wisconsin*, 501 US 171, 175; 111 S Ct 2204; 115 L Ed 2d 158 (1991), the Supreme Court announced settled principles of Sixth Amendment law that are particularly appropriate to the case before this Court:

> The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." In *Michigan v Jackson*, 475 US 625 [106 S Ct 1404; 89 L Ed 2d 631] (1986), we held that once this right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective. It is undisputed, and we accept for purposes of the present case, that at the time petitioner provided the incriminating statements at issue, his Sixth Amendment right had attached and had been invoked with respect to the *West Allis armed robbery*, for which he had been formally charged.
>
> The Sixth Amendment right, however, is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, " 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary

hearing, indictment, information, or arraignment.' " *United States v Gouveia*, 467 US 180, 188 [104 S Ct 2292; 81 L Ed 2d 146 (1984) (quoting *Kirby v Illinois*, 406 US 682, 689 [92 S Ct 1877; 32 L Ed 2d 411] (1972) (plurality opinion)). And just as the right is offense specific, so also its *Michigan v Jackson* effect of invalidating subsequent waivers in police-initiated interviews is offense specific.

The United States Supreme Court in *Maine v Moulton*, 474 US 159; 106 S Ct 477; 88 L Ed 2d 481 (1985), held that a state cannot knowingly exploit an opportunity to confront an accused without counsel being present, once the right to counsel has attached, nor can a state intentionally create such an opportunity. I disagree with the conclusion reached in Judge Smolenski's opinion that *Moulton, supra, United States v Henry*, 447 US 264; 100 S Ct 2183; 65 L Ed 2d 115 (1980), and *Massiah v United States*, 377 US 201; 84 S Ct 1199; 12 L Ed 2d 246 (1964), contain facts that distinguish this case from the application of the rule announced in those cases. Although this case involves a federal drug enforcement agent rather than a paid informant, the fact remains that the federal agent acted in cooperation with a state agent and deliberately elicited information concerning a pending charge from a defendant who was represented by counsel. The factual distinction does not result in a legal difference. The Sixth Amendment offense-specific right to counsel was violated concerning the murder charge.

I disagree with Judge Smolenski's statement that *People v Gonyea*, 421 Mich 462; 365 NW2d 136 (1984), and *Cahill v Rushen*, 501 F Supp 1219 (ED Cal, 1980), aff'd 678 F2d 791 (CA 9, 1982), are distinguishable and therefore not dispositive. I believe the facts of

*Gonyea* and *Cahill* do fall squarely within the general rule that the Sixth Amendment bars the use of incriminating statements that the government has deliberately elicited from a defendant after indictment and in the absence of counsel.

The Court held in *Gonyea* that the defendant had a right to counsel after sentencing. I believe that it necessarily follows that if a defendant in Michigan has the right to counsel that continues after trial, conviction, and sentencing, then a defendant who is at the opposite end of the judicial proceedings facing a preliminary examination has that same right. The prosecution's appeal of the dismissal of the charges certainly was not "final" when defendant gave her statement on February 23, 1993.

Also instructive from *Gonyea* is the Court's discussion of waiver of a right. *Gonyea* demonstrates that the trial court was correct in finding that there was no showing that at the time defendant made her statements to Agent Crock she had intentionally relinquished or abandoned her right to counsel.

Defendant's right to counsel under Michigan Constitution 1963, art 1, § 20 is parallel to and coextensive with the Sixth Amendment right to counsel. The language of Const 1963, art 1, § 20 and the Sixth Amendment is identical as far as the right to counsel is concerned. *Gonyea, supra* at 469.

I believe an application of the authorities pertaining to the Sixth Amendment right to counsel and the narrow application of that particular right is clearly illustrated by the different statements made by defendant to Agent Crock. Defendant's Sixth Amendment right to counsel applies only to statements pertaining to the charge to which the Sixth Amendment right of

counsel had attached. In the case before this Court, that is the murder charge that had been dismissed and that was subject to appeal, continuing the adversary position between the state and defendant. Defendant cannot claim a Sixth Amendment right pertaining to any statements involving the ongoing investigation concerning drug charges. No formal charge had been initiated at the time she made these statements pertaining to those charges. Defendant cannot claim any Sixth Amendment right to counsel pertaining to any statements she made to Crock concerning her efforts to solicit the murder of Antonio Shelby. I agree with the trial court and Judge SMOLENSKI that the Sixth Amendment right to counsel in connection with one charge will not provide a person with a right, privilege, or license to engage in or solicit further criminal activity. On the other hand, if in a government-initiated conversation a person makes statements pertaining to numerous offenses, the government is precluded from using any statements in connection with a matter to which the Sixth Amendment right of counsel has attached.

II. EVIDENTIARY ISSUE CONCERNING THE ADMISSION OF MR. RIGGS' LETTER

I disagree with the conclusion reached by the majority that any error in the admission of the decedent's last letter to his mother was harmless error. I believe that the admission of the entire letter was error.

Relevant evidence refers to evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. MRE 401. Relevant evidence may be

excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. MRE 403.

When a defendant is charged with the murder of a spouse, the deceased spouse's statements concerning marital discord are admissible to show the effect they had on the defendant. *People v Fisher*, 449 Mich 441, 450; 537 NW2d 577 (1995). Statements of a deceased spouse that were not known to the defendant may also be admissible to show the decedent's state of mind with regard to marital discord. *Id.* Evidence of marital discord is relevant to motive because it has some tendency to make the existence of a fact in controversy more or less probable, namely, whether the defendant committed the murder. *Id.* at 453. The portion of decedent's letter concerning his marital troubles was relevant to the marital discord issue and was therefore admissible to show decedent's state of mind. However, the other portions of his letter were irrelevant to marital discord or any other issue in the case.

I would reverse defendant's conviction and remand the matter for a new trial.